(161 App. Div. 98)

THOMPSON v. DILLER et al.

(Supreme Court, Appellate Division, Second Department.   March 6, 1914.)

1. COVENANTS (§ 84*)—RESTRICTIVE BUILDING COVENANTS—VALIDITY.
    Restrictive building covenants in deeds are valid, and will be enforced in equity against subsequent purchasers who buy with notice.
    [Ed. Note.—For other cases, see Covenants, Cent. Dig. §§ 90–92;   Dec. Dig. § 84.*]

2. COVENANTS (§ 79*)—RESTRICTIVE BUILDING COVENANTS—RIGHT OF ENFORCEMENT.
    If it appears that building restrictions in a deed were entered into for the common advantage of all the lot owners in a common tract, the right of enforcement passes to successive lot owners.
    [Ed. Note.—For other cases, see Covenants, Cent. Dig. §§ 78–82;   Dec. Dig. § 79.*]

3. COVENANTS (§ 108*)—RESTRICTIVE BUILDING COVENANTS—ENFORCEMENT—DEFENSES.
    The fact that a purchaser under a deed containing a restrictive covenant for the common advantage of all lot owners, that the north line of the dwelling houses "shall stand five feet from the north line of plot," might build his house across the whole width of the 60-foot lot to the south line and destroy the building scheme, is no defense to the enforcement of the covenant, where the dwelling house in controversy was only 30 feet wide and was placed 22 feet from the north line.
    [Ed. Note.—For other cases, see Covenants, Cent. Dig. §§ 175, 179–185;   Dec. Dig. § 108.*]

4. COVENANTS (§ 51*)—RESTRICTIVE BUILDING COVENANTS—CONSTRUCTION.
    A restrictive covenant in a deed that the "north wall of said dwelling shall stand five feet from the north line of plot" is to be construed as being the exact position of the north wall, and not that the wall could be built no closer to the north line.
    [Ed. Note.—For other cases, see Covenants, Cent. Dig. § 50;   Dec. Dig. § 51.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

5. COVENANTS (§ 108*)—RESTRICTIVE BUILDING COVENANTS—ENFORCEMENT—
DEFENSES.
    Where the original owner of a tract of land platted it and made all
deeds to the lots therein subject to certain specific restrictive covenants
for the common advantage of all lot owners, the right of enforcement of
such covenants by one lot owner against an adjoining lot owner is not de-
feated because, in special instances, the covenants in deeds to other lots
in the tract were varied and different, where such difference was based
on the peculiar location of the lots.
    [Ed. Note.—For other cases, see Covenants, Cent. Dig. §§ 175, 179–185;
Dec. Dig. § 108.*]

6. COVENANTS (§ 51*)—RESTRICTIVE BUILDING COVENANTS—COMMON ADVAN-
TAGE—EXECUTED COVENANTS.
    Where an original owner of a tract of land platted it and made all deeds
to lots therein subject to restrictive building and beauty covenants, and
the subsequent lot owners executed the covenants in accordance with the
common plan, such covenants are to be enforced in the very words used
if free from ambiguity.
    [Ed. Note.—For other cases, see Covenants, Cent. Dig. § 50; Dec. Dig.
§ 51.*]

7. COVENANTS (§ 79*)—RESTRICTIVE BUILDING COVENANTS—CONSTRUCTION.
    A deed from a realty company contained a restrictive covenant that the
north wall of the dwelling house "shall stand at least five feet from the
north line" of plot. The deed also contained a recital that the deed was
subject to covenants contained in deed from original grantor to realty
company. The deed from the original owner contained a covenant that
the north line of the dwelling house "shall stand five feet from the north
line" of plot. Held, that the last purchaser was bound by the original
covenant, and the words "at least" would be considered an inadvertence.
    [Ed. Note.—For other cases, see Covenants, Cent. Dig. §§ 78–82; Dec.
Dig. § 79.*]

8. INJUNCTION (§ 113*)—LACHES.
    One who stands by and suffers another to make large outlays cannot
have injunctive relief.
    [Ed. Note.—For other cases, see Injunction, Cent. Dig. §§ 198–201; Dec.
Dig. § 113.*]

9. INJUNCTION (§ 126*)—RESTRICTIVE BUILDING COVENANTS—ENFORCEMENT—
BURDEN OF PROOF.
    A lot owner who breaks a restrictive building covenant in a deed made
for the common advantage of all lot owners in a common tract has the
burden of proving laches to defeat the right of an adjoining lot owner to
injunctive relief against a breach of the covenant.
    [Ed. Note.—For other cases, see Injunction, Cent. Dig. § 276; Dec. Dig.
§ 126.*]

10. INJUNCTION (§ 113*)—RESTRICTIVE BUILDING COVENANTS—ENFORCEMENT—
LACHES.
    Where the owner of a lot, subject to restrictive building covenants in
his deed, filed his building plans on October 24th, and excavation was
begun November 18th, and notice claiming breach of the covenant was
given December 10th, the right of a nonresident adjoining lot owner to in-
junctive relief was not lost by laches, though a change in the plans to
conform to the covenants would cost $2,000.
    [Ed. Note.—For other cases, see Injunction, Cent. Dig. §§ 198–201; Dec.
Dig. § 113.*]

11. COVENANTS (§ 108*)—RESTRICTIVE BUILDING COVENANTS—ENFORCEMENT—
DEFENSES.
    Where an original owner of a tract of land platted it and made all deeds
to lots therein subject to restrictive building covenants for the common

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

advantage, and a great many houses had been built conforming to the general scheme, the fact that the restrictions were to cease in 1925 was no defense to an enforcement of such covenant in 1914.

[Ed. Note.—For other cases, see Covenants, Cent. Dig. §§ 175, 179–185; Dec. Dig. § 108.*]

12. COVENANTS (§ 51*)—RESTRICTIVE COVENANTS IN DEEDS—CONSTRUCTION.
Covenants in a deed as to the height of the finished grade "at the front line of the house," that there should be no terrace or step between the street sidewalk "and the front line or lines of house," and that no fence or hedge should be erected "near the street line or lines than the front wall or walls of the house," do not prohibit the entrance to a dwelling house being placed at the side.

[Ed. Note.—For other cases, see Covenants, Cent. Dig. § 50; Dec. Dig. § 51.*]

Action by Eva F. Thompson against Frank J. W. Diller and another. Submission upon an agreed state of facts. Judgment rendered.

Submission upon an agreed state of facts of the question in difference between adjoining lot owners, on the easterly side of East Thirteenth street (now Argyle Road), in that portion of Flatbush, in the borough of Brooklyn, known as "Prospect Park South."

In 1899, Mr. Dean Alvord purchased a large tract in Flatbush, extending from Church avenue southerly to Beverly Road, and westerly from the Brighton Beach depressed railroad to Coney Island avenue. He proceeded to develop it, by sewers, gas, electricity, and telephone wires underground, and, in addition to laying out streets and parkways, put in uniform concrete sidewalks, with lawns, flowers, and shade trees. The property thus laid out was divided into about 230 building lots, upon which dwellings have been erected in substantial accordance with the restrictions hereinafter stated. His contracts also provided for a yearly contribution from the several purchasers for the maintenance of the grounds, which is hereafter referred to.

In June, 1905, Mr. Alvord conveyed all of his remaining unsold holdings to the Chelsea Realty Company. This conveyance separately described what is now the plaintiff's lot as parcel 14, and the defendants' lot as parcel 13. This conveyance contained the following covenants applicable to both lots 13 and 14, which are declared to be "real covenants running with the land until January 1, 1925, when they shall cease." The terms thereof are:

"But one dwelling house shall be erected on the plot hereby conveyed. Nothing but a private dwelling for a single family, an automobile house, a summer house, a greenhouse, or a church shall be erected on the property hereby conveyed. No dwelling house costing less than $5,000 shall be erected on the property hereby conveyed except. * * * No part of any building (including piazzas and bow windows) to be erected on this plot shall stand nearer than fifteen feet to the building line of the street upon which said plot fronts. * * * The main north wall of said dwelling house, exclusive of bays, shall stand five feet from the north line of plot. * * * No house erected on said plot shall be built upon a foundation higher than three feet above the finished grade of plot. The finished grade of plot at the front line of the house shall be twelve inches above the curb line of the street in front of said plot, except. * * * No terrace or step shall be permitted between the street sidewalk and the front line or lines of house, except. * * * None but a cement sidewalk, five feet wide, shall be laid in front of said plot from street sidewalk to curb, and but one such sidewalk shall be permitted in front of inside plots, but one on either street in front of corner plots. No fence or hedge shall be erected or maintained on said plot nearer the street line or lines than the front wall or walls of the house, and no fence shall be maintained on any part of the plot exceeding four feet in height. No business of any description shall be conducted upon the property hereby conveyed. No pigsty, cowshed, henhouse, slaughter house, stable for horses or other animals, or other nuisance shall be allowed on said property."

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Plaintiff and defendant both trace their titles to the Chelsea Realty Company; plaintiff being the devisee under the will of her father, John E. Thompson, whose title in 1907 was from conveyance by Lizzie M. Moore, a grantee in April, 1906, from the Chelsea Realty Company. The Chelsea Realty Company, on June 15, 1905, conveyed defendants' present lot to Mr. William S. Liptrott, by deed which repeated in identical words the restrictive covenants contained in the deed from Dean Alvord, except that, as to the northerly wall of the dwelling house to be erected, it read: "And the main northerly wall of said dwelling house, exclusive of bay windows, shall stand at least five (5) feet from the northerly line of said premises." After all of these restrictive covenants came the clause: "The foregoing covenants shall be considered as real covenants running with the land until January 1, 1925, when they shall cease and terminate. Subject also to covenants contained in deed from Dean Alvord to the party of the first part."

The Liptrott deed to defendants, dated June 25, 1913, repeated the same description, covenants, and restrictions, with the further recital that it was subject to the covenants contained in the deed from Dean Alvord to the Chelsea Realty Company.

Defendants are in course of erecting a dwelling, the north line of which is designed to stand about 20 feet south from the north line of their lot. The blueprint shows the exact distance as 22 feet, 4½ inches.

Plaintiff seeks to have defendants place their main north wall five feet from their north line, which would move their house 17 feet further away. Defendants say their main north building line can be "at least" 5 feet away from their north boundary.

On the 60-foot lot frontage, the buildings in the vicinity average from 25 to 40 feet in width. Defendants' proposed house is 30 feet wide. As now designed, it will come within 12 feet of the plaintiff's dwelling, which stands about 5 feet from her north boundary line.

Defendants filed building plans in October, 1913, and began excavating November 18th. They were not notified of any claim of violation of these restrictions until on December 10th, when they had expended $2,171.69. To change the plans and buildings would cost about $2,000. Besides this difference as to the north wall, plaintiff claims that the front entrance should be toward the street, and not at the north side, as now designed.

Argued before JENKS, P. J., and THOMAS, RICH, STAPLETON, and PUTNAM, JJ.

Robert H. Wilson, of Brooklyn, for plaintiff.
William N. Dykman, of Brooklyn, for defendants.

PUTNAM, J. The facts show an elaborated design for the erection of buildings in a select neighborhood, by what the English courts call a "building scheme," in which the lotted lands are laid out for private dwellings, and reserved from disturbance by inroads of business. Restrictive covenants to that end are familiar. They exclude buildings other than private residences; they determine their character by providing for a minimum cost, with a set-back restriction to keep the houses from being too near the street. Silberman v. Uhrlaub, 116 App. Div. 869, 102 N. Y. Supp. 299. Besides protecting from the encroachment of trade, and guarding against cheaper houses, provision is made for only one dwelling on a specified lot, with other efforts for uniformity of general effect. The objects are said to be for "light, air, ornamentation, or the exclusion of occupations which would render the entire property unsuitable for the purposes to which it could be most advantageously devoted." Trustees of Columbia College v. Lynch, 70 N. Y. 440, 446 (26 Am. Rep. 615).

[1] Such covenants are valid, and enforced by equity against subsequent purchasers who buy with notice thereof. As was said by Lord Cairns:

"All that a court of equity has to do is to say by way of injunction, that which the parties have already said by way of covenant." Doherty v. Allman (1878) 3 App. Cas. 709, 720.

No English judicial decision or dictum has attempted to define the extent to which restrictions affecting the user of land can be imposed by covenants. Jenks' Dig. Civil Law, Book III, p. 807, note (1913).

[2, 3] If it appears that such restrictions were entered into for the common advantage, the right of enforcement passes to successive lot owners. Each proprietor is thenceforward interested in having his neighbor's lots, and the buildings thereon, used in such a way as to "preserve the general uniformity and respectability of the row." Whatman v. Gibson, 9 Sim. 196. These advantages are not only to keep noxious trades out of a new residence quarter, but are to promote the amenities of neighborhood building, so that the pleasant natural effect preserved by such a covenant is sometimes called an "amenity." Trustees of Columbia College v. Lynch, supra; Coudert v. Sayre, 46 N. J. Eq. 386, 19 Atl. 190. Restrictions for beauty have not been limited to the buildings alone. Thus we have an example of lots sold, with covenants to leave open and unbuilt upon the portions of the restricted lots that are colored blue upon an accompanying plan. Such covenants provide for uniformity in mode of building, so that "the enjoyment which springs from regularity in a series of dwellings may be preserved." Peek v. Matthews (1867) L. R. 3 Equity, 515. The present north wall covenant was obviously for uniformity, as well as perhaps, by means of these open spaces, to secure better protection against the spread of fire. It might be argued, however, that it does not prevent a builder from stretching his house to cover 55 feet of his lot. Such an abnormal departure from usage is not to be anticipated, and its bare possibility cannot entitle a builder to ignore the northerly line, and start his house on the southern half of the restricted lot. The fact that a building of extraordinary width might defeat the purpose of the restriction will not authorize a house 30 feet wide to be set 22 feet from the north line and 8 feet from the south boundary. The restriction aims to regulate the open spacing between these buildings, the value and enjoyment whereof depend on a size reasonably appropriate to its site. The natural effect of these restrictions is to project the piazzas along the southern sides of these dwellings; the house as extended and widened by these additions leaves but a moderate margin, perhaps little more than a driveway along the southern part of the lot. Still, by starting a building five feet from the north line, there may be left at the southern portion a space for grass plots or gardens much more effective by being arranged at the south side of the house, instead of the broken effect of such spaces on both sides. The benefits thereby are at least coextensive with the burden of this restriction upon the freedom of building.

[4] This covenant, providing that the main north wall shall stand five feet from the edge of the lot, was evidently framed so as to align

the houses in an open harmonious setting. To construe it to read "not nearer than five feet" would miss its spirit and purpose, as it would violate its letter. Such a construction, making elastic the provision for the north building line, would let a purchaser build anywhere within the remaining 55 feet breadth of the lot, even up against its very south boundary.

[5] The different and varying covenants in certain special parcels conveyed in Mr. Alvord's deed are not overlooked. But such parcels are along the outer edges of his park scheme, where there was no land alongside to be protected, or the localities were shown to be otherwise exceptional by the superior size of the lots, or the greater width of the road on which they front. These exceptions in no wise detract from the uniformity of the design, which is impartially carried out. No power of dispensation was reserved or was attempted. To no favored lot owner was immunity promised for any departures from his covenant, as in Beals v. Case, 138 Mass. 138.

[6] Such a covenant stands not only on its continued use in a general series of conveyances, repeated as to the lots abutting on the six streets running north and south in this development. The covenant has now become executed and embodied by buildings standing in substantial accord with its requirements. A plan thus impressed upon the property, which the parties have themselves made effective according to its literal terms, is to be enforced in the very words used, if free from ambiguity. As Church, Ch. J., said:

"The covenant was lawful; the parties had a right to make it, and we have no power to change or alter it." Atlantic Dock Co. v. Libby, 45 N. Y. 499, 504.

In furtherance of the plan of maintaining a general care of all the lot fronts, even after they should be held in severalty, Mr. Alvord required each buyer to contract to pay a yearly sum for cleaning crosswalks, and sidewalks, and for the upkeep of the lawns and shrubbery beds between the sidewalks and curb. All of which indicates an improvement plan made for an entire community of lot owners as a general regulation, or as "a law perfectly well understood, and one calculated and intended to add to the security of the lessees, and consequently to increase the price of the houses." Spicer v. Martin, 14 App. Cas. 12, 25. See, also, De Mattos v. Gibson, 4 De Gex. & J. 276.

[7] Defendants, however, trace their title through Mr. W. S. Liptrott, who bought from the Chelsea Realty Company June 15, 1905. This conveyance substantially copied the Alvord restrictions, except that it provided that the main northerly wall, "exclusive of bay windows, shall stand at least five (5) feet from the northerly line of said premises." After these other covenants was the recital: "Subject also to covenants contained in deed from Dean Alvord to the party of the first part." The same forms were repeated in the conveyance from Mr. Liptrott to defendants, which also contained a recital referring to the covenants in the Alvord deed.

In 1905, when Mr. Alvord conveyed his unsold lots to the Chelsea Realty Company, his building scheme with these restrictions had been in active operation over five years. By including these restrictions in his conveyance of all the unsold lots, he made it manifest that such

restrictions were for the common advantage and did not create and continue a mere personal obligation. Brouwer v. Jones, 23 Barb. 153.

As the benefit of these covenants is part of the security enjoyed by all past and future lot owners, neither Mr. Alvord himself, nor the Chelsea Realty Company as his successor in title, could thereafter release, annul, or modify such restrictions, which as part of the values of the restricted lots are not to be taken away while the original scheme is preserved, and the neighborhood keeps its residential character. Western v. Macdermot, L. R. 1 Equity, 499; Spicer v. Martin, supra; Coudert v. Sayre, supra.

This conveyance to Mr. Liptrott shows no intent to do away with the original Alvord restrictions. The more natural inference is that the words "at least" crept in by inadvertence. The true purpose appears by the express reincorporation of the Alvord covenants. But the question of the Chelsea Realty Company's intent is unimportant, in view of its lack of power and the controlling effect of the original restrictions appearing of record. Even had the Chelsea Realty Company given a general warranty deed, with no restriction whatever, the purchaser's user would still be subject to the original Alvord restrictions, as contained in the conveyance forming part of his chain of title. Nottingham Patent Brick & Tile Co. v. Butler, 16 Q. B. D. 778; Clements v. Welles, L. R. 1 Equity, 200; Whatman v. Gibson, supra; Atlantic Dock Co. v. Leavitt, 54 N. Y. 35, 13 Am. Rep. 556.

[8, 9] We are reminded that a plaintiff who lies by and suffers defendant to make large outlays cannot have injunctive relief. But one who has broken such a covenant has the burden of proving laches. Elliston v. Reacher (1908) 2 Chan. Div. 374, 392.

[10] The defendants' building plans were filed October 24th, excavation began November 18th, and a notice claiming breach of the covenant, from counsel for the Prospect Park South Association, followed on December 10th. The foundations, with the first floor-beams, had then been laid. To change the plans and reset the foundation will cost approximately $2,000. Considering that the neighboring residents seldom go to the Building Department to inspect plans, and that the staked-out lines for excavation do not necessarily show the outer inclosing walls, it cannot be held that the rights of plaintiff, a nonresident of this state, were lost by this delay of 22 days after excavation had been started. Joyce on Injunctions, § 488; Adams v. Howell, 58 Misc. Rep. 435, 108 N. Y. Supp. 945.

[11] It is also urged that the court should now hold its hand because these restrictions are to cease in 1925.

Mr. Alvord imposed a moderate period for the life of his restrictions. Doubtless, he thought that by 1925 the land would be built over and the advantages of his system made apparent, so that the duty, first compulsory, would then require no legal sanction. Such a time limit, however, where the original scheme has been preserved (and where the residential character of the surroundings has not declined, as in Roth v. Jung, 79 App. Div. 1, 79 N. Y. Supp. 822, and has not been invaded by elevated railroads as at upper Sixth Avenue, Manhattan, Trustees of Columbia College v. Thacher, 87 N. Y. 311, 41 Am. Rep.

365), should not invalidate or weaken the covenant, which has still 11 years to run.   Indeed, the fact that since imposing the restriction so many lots have been built upon, in reliance that it shall last till 1925, is a strong reason why the court should not take away this protection before the date when it ceases by its terms.

[12] Besides the question of the north wall, plaintiff objects to defendants' house having an end toward the street and its main entrance on the north side.   He urges that the restrictions clearly point to a house with front entrance directly on the street.   The covenants relied on are as to height of the finished grade "at the front line of the house," without terrace or step between the street sidewalk "and the front line or lines of house"; and the clause that no fence or hedge shall be erected "nearer the street line or lines than the front wall or walls of the house."

These covenants certainly restrict the grading and the front lot surface between the house and the street.   They may conduce to the effect of a broader street vista, unbroken by projecting fences or banks of varying heights.   But it is not clear that a house which otherwise conformed to the site requirements may not legally have a side entrance.   An adequate approach and side entrance along this five-foot strip at the northern side may present serious architectural problems, indeed difficulties such as perhaps may require modification of the present design.   Where, however, such an entrance restriction is not express, and does not arise by clear implication, the court cannot read into a conveyance such an additional limitation on the right to build going beyond those express restrictions so comprehensively elaborated.

Under this submission, the judgment should enjoin and restrain the defendants, in the erection of their proposed dwelling house on Argyle Road, from departing from and violating the restriction that the main north wall of their dwelling house, exclusive of bays, shall stand five feet from the north line of their plot, being the parcel numbered thirteenth in the deed from Dean Alvord to the Chelsea Realty Company, dated June 1, 1905, and recorded in the Kings county register's office June 14, 1905, in section 16, Liber 40 of Conveyances, p. 524, which judgment, pursuant to the stipulation of the parties, is without costs.   All concur.