OPINION OF THE COURT
Fuchsberg, J.
By this article 78 proceeding in the nature of mandamus, petitioners, New York City firemen retired for service-incurred disabilities, challenge the authority of the administrators of the pension funds[1] of which they are members to deny each *491 of them a "supplemental retirement allowance * * * determined on the basis of the consumer price index” as provided by section 207-i of the General Municipal Law. In refusing to make payment, the funds had taken the position that it would be impermissible for them to do so because it would be duplicative of one otherwise provided by New York City local laws. The resolution of this dispute turns on the construction of section 207-i and the relevant provisions of the New York City Administrative Code.
All the petitioners retired prior to July 1, 1965. Each one’s pension[2] had been fixed at three fourths of his annual "compensation or salary” as of the time of retirement (Administrative Code of City of New York, § B19-4.0, subd a, pars 1, 2; § B19-7.89). The years that intervened between that date and the time when the controversy before us arose witnessed the adoption of a series of State and local laws, including section 207-i. Both the statutes and the economic, political and public employment climate in which they came into being are relevant to our analysis (see, generally, Tilove, Public Employee Pension Funds [1976], esp pp 274-280, 291-294).
Threading our way through the legislation, we start in 1966, when the city increased pension benefits for all disability retirees to the greater of either their prior pensions or "one-half of the earnable salary or compensation of a first grade fireman on July first, nineteen hundred and sixty-five” (Administrative Code, §§ B19-4.1, B19-7.891 [amd 1973]). These sections, however, expressly specified that the benefits were to be "in lieu of any supplemental retirement allowance which would otherwise be payable * * * under the provisions of any other law”.
It was in the following year, 1967, that, by enacting section 207-i of the General Municipal Law, the State Legislature established a uniform cost of living escalator for retirees of all city fire departments.[3] After providing that city firemen’s supplemental retirement allowances "shall be determined on the basis of the consumer price index (all items — United States city average), published by the United States Bureau of Labor Statistics” and shall be paid by the municipality that had employed the retirees, section 207-i, like the New York *492 City plan, went on to speak in terms of an alternative allowance. In that regard, its subdivision c read (L 1967, ch 546): "The benefits hereinabove provided for shall be in lieu of the benefits presently provided by any other general, special or local law unless such benefits are in excess of those provided by this section, in which latter case such benefits shall be paid by the retirement system pursuant to this action”. The somewhat confusing mandate of subdivision c has been construed as not barring payments under section 207-i if the pensioner enjoys the benefits of any other law that provides "equalizer” as distinguished from supplemental cost of living payments (Matter of Rivington v Lowery, 70 Misc 2d 155, affd without opn 41 AD2d 703, mot for lv to app den 32 NY2d 613).
On December 27, 1973, a major revision of the New York City code became effective. Local Laws 92 and 93 of that year increased the minimum pension from one half to three fourths of the annual salary payable to a first grade fireman as of July 1, 1965. At the same time, it also removed the code’s restriction against a pensioner’s eligibility for its benefits while also receiving pension payments under any other law (Administrative Code, §§ B19-4.1, B19-7.891 [current version]).[4]
This was the state of the statutory law when, on February 12, 1974, petitioner Walter Sheerin, President of the "Retired Line of Duty” New York Police and Firemen’s Association, wrote the Chairman of the Mayor’s Pension Committee to request that pensions under the revised code be supplemented by section 207-i cost of living payments. The response, made by the city’s Corporation Counsel on the ensuing April 25, took the form of a formal opinion that petitioners were entitled to receive only whichever was greater, i.e., either the section 207-i benefits or the amounts payable under the *493 amended code sections, but not both. Despite this official advice, more than two years were to pass before the petitioners took further action. When they did, on July 28, 1976, it was by written demand for payment of the section 207-i increments made upon the chairman of the pension funds by counsel for the retirees.
The funds’ rejection, dispatched on September 21, was closely followed by the initiation of this proceeding on September 28. Granting the petition, Special Term ordered the commencement of section 207-i payments as of July 1, 1977, the first scheduled payment date that would follow the entry of judgment. The Appellate Division, one Justice dissenting on the merits, modified only to the extent of making the payments retroactive to the date upon which the demand was deemed to have been made, August 1, 1976 (60 AD2d 555).[5] For the ensuing reasons, we believe the order of modification should be upheld.
Initially, we note our agreement with Matter of Rivington v Lowery (70 Misc 2d 155, supra) in its construction of the term "benefits” as it is employed in subdivision c of section 207-i. Rivington held that subdivision c did not bar payment of section 207-i benefits to retirees receiving "equalizer” supplements under other laws, i.e., those enjoying special allowances as a result of corrective changes in their pension base. This interpretation recognizes that the purpose of the statute was to allay the devastating effect on pensioners of the monetary inflation which even by then had already reached substantial proportions (cf. Governor’s Memorandum on Approving L 1967, ch 727, NY Legis Ann, 1967, p 290). Obviously, that purpose would be advanced by including cost of living payments to retirees whose pension base, though adjusted, remained a fixed sum constantly undermined by the pressure of unremitting increases in living costs; such payments are to be contrasted with the duplication that might be regarded as inherent in allowing section 207-i benefits to pensioners already receiving cost of living increments. Moreover, this construction of the term "benefits” acknowledges that, as a statute intended to apply to a great number of differing local programs, subdivision c of section 207-i could not employ a more specific or limited description of what it prohibited *494 without running the risk of causing further conflicts and ambiguities (see Matter of Rivington v Lowery, 70 Misc 2d 155, 158, supra).
To read the statute more restrictively would also call upon us to ignore the peculiar nature of the hardships which inflation was then visiting on public employees. In the 1960’s, wages in the public sector were still lagging considerably behind those in private industry. The promise of a secure retirement, a major countervailing benefit of public employment, was turning out to be illusory, since inflation strikes with particular virulence at retirees and others living on fixed incomes. For public employees, whose pensions were then based on over-modest salaries to begin with, it was all the worse. Legislators could hardly have been oblivious to these facts, all the more so since increasingly active public employee organizations made no secret of the problems. It was therefore neither illogical nor unexpected that the legislative response was to both increase the base and provide a cost of living adjustment. (See, Rosow, Public Sector Pay and Benefits, 36 Pub Admin Rev 538, 539; see, also, Munnell, Private Pensions and Savings: New Evidence, 84 J Political Economy, 1013, 1014 [1976].)
The timeliness and the extent of the Legislature’s expressed concern with the cost of living is borne out further by the fact that between July, 1965, the date by which all the petitioners had retired, and 1973, the year when Local Laws 92 and 93 were enacted, the cost of living index rose to a point at which consumer prices had increased by almost half again over what they had been at the outset of that interval (see US Department of Labor, Bureau of Labor Statistics, Consumer Price Index for All Urban Consumers [1979]).[6] In taking note of these public records, it may not be amiss to observe that recognized authorities regard the consumer price index as a too conservative measure of the full increase in living costs for older people, who of course include most pensioners (Borzilleri, The Need for a Separate Consumer Price Index for Older Persons, 18 Gerontologist 230; see, also, Shiskin, Updating the Consumer Price Index — An Overview, 97 Monthly Labor Rev [July, 1974], p 3).
All this leads us to reject the argument that the Legislature *495 intended to withhold its section 207-i grant of cost of living supplements from pensioners who were not already receiving inflation escalators under other laws. Instead, we conclude that, unless the benefits payable to disability retirees under the city code as amended in 1973 are transitory cost of living supplements, petitioners are entitled to section 207-i payments. Turning then to the code sections, although it appears clear these too were enacted with full awareness of the problem of inflation, we hold that benefits received thereunder are not such transitory cost of living supplements.
Rivington again is helpful to our analysis. In that case, an amendment to the code had changed the retirees’ pension base from one half of the average of their final five years’ compensation to one half of their annual salary on the date of retirement. The court there found this to be a "corrective payment” designed to equalize treatment of different groups of retirees. As such, it became a vested component of the pension res, and, even though the adjustment also had the effect of offsetting inflation, it was not deemed to be the sort of cost of living supplement that would bar corresponding payments under section 207-i (see 70 Mise 2d, pp 157, 158).
Similarly, Local Laws 92 and 93 act upon the base, in this instance by changing the percentage of the salary on which the pensions are to be computed. This one-shot adjustment simply cannot be compared with periodically readjusted and renewed payments directly pegged to the fluctuating cost of living index, such as those in section 207-i itself.
Corroborative of this determination is the city’s deletion of the "in lieu of other supplemental allowances” clause when it amended sections B19-4.1 and B19-7.891 in 1973. Although these local enactments could not supersede the terms of a State statute were it otherwise applicable, the circumstances suggest a local legislative intent that Local Laws 92 and 93 not be construed as an attempt to provide a cost of living supplement.
The main issue resolved, we now treat with the Appellate Division’s denial of relief with respect to payment periods prior to petitioners’ demand on August 1, 1976. Doing so, we first observe that, while invocation of the equitable defense of laches ordinarily requires a showing of prejudice (Siegel, New York Practice, § 36, p 39), when the doctrine is invoked in an article 78 proceeding in the nature of mandamus, proof of *496 unexcused delay without more may be enough (Austin v Board of Higher Educ., 5 NY2d 430, 442; Matter of Peruzzin v Test, 282 App Div 550; see, generally, 8 Weinstein-Korn-Miller, NY Civ Prac, par 7804.02, pp 78-108; 24 Carmody-Wait 2d, NY Prac, § 145:245).
Moreover, even where a petitioner’s legal right to the relief sought is clearly established, issuance of a writ of mandamus is a matter reserved for the sound discretion of the court (Matter of Crane Co. v Anaconda Co., 39 NY2d 14, 18). In appropriate cases, incident to the exercise or withholding of relief thus dependent on their favor, courts are possessed of power to apply the doctrine of laches in fashioning a remedy. And we may review only "those rare cases * * * where the circumstances leave no possible scope for the reasonable exercise of discretion” (Matter of Durr v Paragon Trading Corp., 270 NY 464, 469).
Nevertheless, the petitioners appear to contend that while laches, in proper circumstances, may be invoked to deny mandamus, once the right is established, laches is unavailable to restrict — or presumably, to enlarge — the remedy to cover a period longer or shorter than that prescribed by any available Statute of Limitations. This is too broad an assertion. Though functioning for purposes of equitable relief as the counterpart of a Statute of Limitations, to which it may be analogized but to whose provisions it owes no necessary obeisance, laches is designed to introduce flexibility into the process of determining when rights have been asserted so unseasonably that a point at which they should be barred has been reached (see, generally, 2 Pomeroy, Equity Jurisprudence [5th ed], § 419a; Buswell, Limitations and Adverse Possessions, §§ 19-20).
So, in instances of enforcement of zoning regulations or deed restrictions, delay in instituting legal proceedings to enforce recognized rights may result in a denial of injunctive relief and a limitation of the remedy to one at law (Matter of Eberhart v La Pilar Realty Co., 45 AD2d 679 [zoning]; Ufier v Baldwin, 33 Misc 2d 848 [zoning]; Thompson v Diller, 161 App Div 98 [restrictive covenant]; Cummins v Colgate Props. Corp., 2 Misc 2d 301, affd 2 AD2d 749, mot for lv to app den 2 AD2d 810, mot for lv to app den 2 NY2d 707 [restrictive covenant]). Comparable too, and not unlike the case before us, would be an action at law on an installment obligation in which the Statute of Limitations is applied to preclude recovery of *497 payments past due while collection of amounts accruing after the effective date of the time bar is permitted (cf. Walsh v Andorn, 33 NY2d 503). Withal, of course, the power to invoke laches is not untrammeled. For, while a time bar is usually said to affect the remedy, the practical consequence of its interposition is at least as often the difference between life or death for the right as well (see Buswell, Limitations and Adverse Possessions, § 1; Siegel, New York Practice, § 34).
These principles were not abused in the present case. Significantly, the petitioners here offered not the slightest hint of an explanation for the two-year lapse between the time the city first made its refusal to pay evident and the time the petition was served. Indeed, the position of the city — and, therefore, of the pension funds — was clear from almost the very enactment of Local Laws 92 and 93. Additionally, though it is not a sine qua non, the city may well have suffered prejudice from the delay; it argues that its ability to plan and budget its expenditures — and even its ability to undertake a timely correction of the allegedly unforeseen problems caused by its 1973 action — would have been unfairly disrupted by awarding retroactive relief. Under all these circumstances, the Appellate Division cannot be faulted for determining that the relief be effective as of the date of demand.
Accordingly, the order appealed from should be affirmed, without costs.
Chief Judge Cooke and Judges Jasen, Gabrielli, Jones and Wachtler concur with Judge Fuchsberg.
Order affirmed.

. These funds were established pursuant to section B19-1.0 et seq. and section B197.0 et seq. of the New York City Administrative Code and are known as the New York City Fire Department Articles 1 and IB Pension Funds.

. Or "retirement allowance”, which, for the purposes of this appeal, is identical.

. Subsequent amendments of section 207-i of the General Municipal Law were confined largely to enlarging the class of retirees to which it applied by advancing the date before which those eligible had to have' retired.

. Section B19-4.1 of the Administrative Code: "Service incurred disability benefits in the case of retirements prior to July 1, 1965. * * * [I]n any case where a pension was awarded * * * by reason of the retirement of a member for disability caused or induced by the actual performance of the duties of his position, prior to July 1, 1965, such member shall be entitled to a pension of not less than three-fourths the annual salary or compensation payable to a first grade fireman as of July 1, 1965. In the case of any member receiving a pension less than three-fourths the annual salary or compensation of a first grade fireman as of July 1, 1965, his pension will be increased to an amount which will equal three-fourths the annual salary or compensation of a first grade fireman as of July 1, 1965.”.
Section B19-7.891 of the Administrative Code contains identical language except that it refers to "retirement allowances” payable to members of the Article IB Pension Fund.

. The demand, mailed on July 28, 1976, was treated as though received three days later (CPLR 2103, subd [b], par 2).

. The trend so evident then has continued to escalate to a point where the consumer price index for December, 1978 is now 114.3% over that for June, 1965.