# State of New York
# Court of Appeals

OPINION

This opinion is uncorrected and subject to revision before publication in the New York Reports.

No. 90
In the Matter of Anthony S.
Hoffmann, et al.,
     Respondents,
    v.
New York State Independent
Redistricting Commission, et al.,
     Respondents,
Independent Redistricting
Commissioner Ross Brady, et al.,
     Appellants,
Tim Harkenrider, et al.,
     Appellants.

Misha Tseytlin, for Harkenrider appellants.
Timothy F. Hill, for Brady appellants.
Aria C. Branch, for Hoffman respondents.
Jessica Ring Amunson, for Jenkins respondents.
Andrea W. Trento, for amici curiae Kathy Hochul et al.
Lawyers Democracy Fund, League of Women Voters of New York State, Mark Favors et al., amici curiae.

WILSON, Chief Judge:

In 2014, the voters of New York amended our Constitution to provide that legislative districts be drawn by an Independent Redistricting Commission (IRC). The Constitution demands that process, not districts drawn by courts. Nevertheless, the IRC failed to discharge its constitutional duty. That dereliction is undisputed. The Appellate Division concluded that the IRC can be compelled to reconvene to fulfill that duty; we agree. There is no reason the Constitution should be disregarded.

I.

Every ten years, congressional, state senate, and state assembly districts are reapportioned based on the federal decennial census (*see* NY Const, art III, § 4 [a]). Historically, as is true for the vast majority of states, New York's redistricting process was controlled almost entirely by the legislature,[1] subject to certain limitations imposed by federal law (such as the Equal Protection Clause or the Voting Rights Act). Unfettered legislative redistricting led to decade after decade of stalemates, allegations of partisan gerrymandering, and judicially drafted plans. Thus, in 2014, New Yorkers voted to amend the Constitution to "significantly and permanently" reform the redistricting process (Governor's Approval Mem, Bill Jacket, L 2012, ch 17 at 5).

As we noted in *Harkenrider*, the surrounding context and history of the 2014 amendments illustrate that they were "carefully crafted to guarantee that redistricting maps have their origin in the collective and transparent work product of a bipartisan commission that is *constitutionally required* to pursue consensus to draw district lines" (*Matter of Harkenrider v Hochul*, 38 NY3d 494, 513-514 [2022] [emphasis added]). Prior to the amendments, exclusive legislative control often left opposing political parties— particularly with respect to the congressional maps—unable to reach consensus on district lines (*see id.* at 502). The process was "plagued with allegations of partisan

---

[1] The State Legislative Task Force on Demographic Research and Reapportionment was created in 1978 as an advisory task force composed of lawmakers and staff selected by legislative leaders to conduct studies and develop redistricting plans for the New York State Legislature (*see* Legislative Law § 83-m; L 1978, ch 45, § 1; *see also Rodriguez v Pataki*, 308 F Supp 2d 346, 354 [SDNY 2004]).

gerrymandering" (*id.* at 503) and often resulted in "predictable" litigation in federal courts every ten years (*Favors v Cuomo,* 2012 WL 928223, *1 [EDNY 2012]; *see also Rodriguez v Pataki*, 2002 WL 1058054, *1 [SDNY 2002]; *Puerto Rican Legal Defense & Educ. Fund, Inc. v Gantt*, 796 F Supp 681, 684 [EDNY 1992]; *Flateau v Anderson,* 537 F Supp 257, 258 [SDNY 1982]).

Notably, in each decennial redistricting dating back to 1982, the legislature's redistricting quagmire resulted in eerily similar bouts of litigation.[2]  As to each of those redistrictings, parties requested courts to step in and conduct the redistricting with the aid of special masters (in federal court) or special referees (in state court).

<u>1982</u>

In 1982, the State Legislative Task Force on Demographic Research and Reapportionment's (Task Force) deadlock led to the creation of three redistricting plans for senate and congressional districts in the following order: (1) plans wholly created by

---

[2] Indeed, legal challenges to New York legislative apportionment and redistricting go farther back than 1982 (*see Matter of Sherrill v O'Brien*, 188 NY 185 [1907]; *Matter of Reynolds*, 202 NY 430 [1911]).  In 1964, the Supreme Court of the United States held both houses of the New York legislature were malapportioned, violating the Fourteenth Amendment to the federal constitution (*see WMCA, Inc. v Lomenzo*, 377 US 633, 636-637 [1964]).  Our Court in *Matter of Orans* effectively judicially modified the apportionment laws that violated federal standards (15 NY2d 339, 350-355 [1965]).  The early 1970s were similarly riddled with litigation over New York's apportionment as violative of the Voting Rights Act (*see New York ex rel. New York County v United States*, 419 US 888 [1974]), which concluded with revisions to the redistricting plan that wound up litigated, once again, in the U.S. Supreme Court (*see United Jewish Organizations of Williamsburgh, Inc. v Carey*, 430 US 144, 155 [1977] [holding the New York Legislature seeking to comply with the Voting Rights Act did not violate the Fourteenth and Fifteenth Amendments by deliberately revising its reapportionment plan along racial lines]).

the legislature, which the Justice Department disapproved as violating the Voting Rights Act; (2) plans developed by a special master reporting to a federal court; and (3) plans drafted and ultimately enacted by the legislature but with the Justice Department "guiding its pen" (Roman Hedges & Carl P. Carlucci, *Reapportionment Under the Voting Rights Act: The Case of New York*, 1983 NYS Legislative Task Force on Demographic Research and Reapportionment at 14). The federal court intervened pursuant to a lawsuit in which all but one plaintiff requested the court to "order New York State to enact a constitutional plan of reapportionment" and failing that, requested that the district court "devise a reapportionment plan" (*Flateau*, 537 F Supp at 259). The remaining plaintiff requested that the court itself "immediately redistrict the State" (*id.*). Although the legislature's plan was ultimately enacted, thus began the ten-year cycle of the federal court enlisting the help of a special master to prepare a redistricting plan in the event the legislature failed to do so.

<u>1992</u>

Ten years later, in 1992, partisan politics once again deadlocked the Task Force (*Gantt*, 796 F Supp at 685; *see also Diaz v Silver*, 978 F Supp 96, 99 [EDNY 1997]). Parallel actions in state and federal court sought to compel the development of a lawful redistricting plan (*Diaz*, 978 F Supp at 99). In response, the federal court ordered a special master to develop a redistricting plan that would comply with federal law. The state court appointed a panel of three referees to develop a plan that would comply with federal and state law (*id.*). Each court adopted their respective experts' plans, at which point the federal plan would take effect unless the legislature adopted the state plan (*id.*). The legislature,

"who until then had not been able to agree upon a plan which satisfied both sides of the political aisle, promptly embraced the state court's plan as [its] own and enacted it" (*Gantt*, 796 F Supp at 698). Even though the United States Department of Justice had precleared that plan, three years later, a group of Black and Hispanic voters sued to challenge the plan as unconstitutional. That suit ultimately required the legislature to change the maps once again (*Diaz*, 978 F Supp at 96).

<u>2002</u>

In 2002, both the federal and state courts were once again asked to intervene to "ensure that Congressional district lines [were] drawn in time for the fair and orderly conduct of the primary and general elections to be held in 2002" (*Pataki*, 2002 WL 1058054, *1; *see also Rodriguez v Pataki*, 308 F Supp 2d 346, 355 [SDNY 2004] [the companion state court case requested the court " 'set a reasonable deadline for state authorities to enact redistricting plans and obtain (United States Department of Justice) pre-clearance thereof' and adopt and promulgate new districts in the event of a failure by the Legislature to act in time for the 2002 elections"]). Once again, the federal court appointed a special master and the state court appointed a special referee, with both courts adopting the plans proposed by their respective experts (*Pataki*, 308 F Supp 2d at 357-358). As in 1992, the federal court noted its willingness to defer to the State, offering that it would withdraw the federal plan if the legislature adopted "appropriate and lawful modifications" (*Pataki*, 2002 WL 1058054, *8). Shortly thereafter, the legislature adopted a congressional redistricting plan of its own, which was subsequently precleared, and the federal court withdrew its plan (*Pataki*, 308 F Supp 2d at 358). Elections were held using the

legislature's plan, after which consolidated plaintiffs from the 2002 state and federal companion cases filed suit substantively challenging the congressional map (*id.* at 359). In 2004, the federal court dismissed the plaintiffs' claims, and the U.S. Supreme Court upheld that dismissal (*id.* at 460-461; *Rodriguez v Pataki*, 543 US 997 [2004]).

## 2012

That tortured history brings us to 2012—the redistricting cycle that immediately preceded the 2014 constitutional amendments. In 2012, with less than 24 hours until the start of the petitioning process for congressional primaries, the legislature failed to pass a congressional plan (*Favors*, 2012 WL 928223, *1 ["In the past, judicial creation of a congressional redistricting plan has spurred the New York legislature to produce its own plan just in time to avoid implementation of the judicial plan. . . . This time is different"]). As a result, the court delegated the task of creating a congressional redistricting plan to a federal magistrate judge (*Favors v Cuomo*, 39 F Supp 3d 276, 285 [EDNY 2014]). With the help of an "expert in election law and redistricting," the magistrate judge drafted a congressional redistricting plan, which the federal court ordered the legislature to implement (*id.*). The result was a judicially drafted congressional redistricting plan and assembly and senate maps enacted by the legislature that were widely criticized as being gerrymandered (*see Harkenrider*, 38 NY3d at 513; *see also* Thomas Kaplan, *An Update on New York Redistricting*, NY Times, March 9, 2012).

## 2014

The People of New York voted to amend New York's Constitution and create the IRC against that long history. Faced with decades of failed legislative redistricting and the

concomitant court challenges leading to court-drawn districts or the threat of the same to compel legislative compliance, the legislature proposed the constitutional amendments creating the IRC process through concurrent resolutions adopted in 2012 and 2013. The adoption of those resolutions in successive years placed the question before the voters on the November 2014 ballot. The voters approved the reforms by a margin of nearly half a million votes.

The resulting constitutional amendments created the IRC—a bipartisan, ten-person commission mandated to reflect the "diversity of the state"—as a mechanism to provide an "historic level of independence and transparency while protecting minority voting rights and communities of interest" (Governor's Approval Mem, Bill Jacket, L 2012, ch 17 at 7; *see* NY Const, art III, §§ 5-b [a] [1]-[5], [b]-[c]).[3]

That was the promise of the 2014 constitutional amendments—a promise to "unequivocally" reform the "redistricting process permanently" by "provid[ing] transparency to a process cloaked in secrecy" and respite from "legal challenges to partisan gerrymandering" (Governor's Approval Mem, Bill Jacket, L 2012, ch 17 at 5; Assembly Mem in Support, 2012 NY Senate-Assembly Concurrent Resolution S6698, A9526 Sponsor Memo, S2107). It was a promise adopted by two consecutive legislatures and New York voters by a wide margin to both avoid legislative gerrymandering *and* judicial

---

[3] The 2014 amendments also placed substantive requirements on the creation of districts including: the protection of racial and language minority voting rights; contiguity and compactness of districts; and a preference for the maintenance of existing districts, of pre-existing political subdivisions, and of communities of interest (*see* NY Const, art III, § 4 [c]).

intervention in the redistricting process except to the minimum necessary (*see Harkenrider*, 38 NY3d at 513).

Thus, our Constitution now mandates that the IRC prepare and submit a redistricting plan, with appropriate implementing legislation, to the legislature for a vote without amendment (*see* NY Const, art III, § 4 [b]). The plan and legislation must be submitted to the legislature "no later than January fifteenth in the year ending in two" (*id.*). If the legislature fails to approve that redistricting plan, or if the governor vetoes it and the legislature does not override the veto, the legislature or the governor must notify the IRC of the rejection (*see id.*). The IRC must then prepare a second redistricting plan with the necessary implementing legislation "[w]ithin fifteen days of such notification and in no case later than February twenty-eighth," and resubmit it to the legislature for a vote without amendment (*id.*). If the second redistricting plan fails to pass the legislature, or if it is subject to a veto, then the legislature may amend the maps drawn by the IRC (*see id.*). According to a statute enacted as a companion to the 2014 constitutional amendments, any legislative alteration of IRC-drawn districts cannot affect more than two percent of the population in any district (*see* L 2012, ch 17, § 3).

Unfortunately, the new constitutional process broke down the first time it became applicable. Following the 2020 census, the newly established IRC convened in 2021 and, as required, held public hearings throughout the state, receiving input from voters and stakeholders on the process (*see* NY Const, art III, § 4 [c]; *Harkenrider*, 38 NY3d at 504). Simultaneously, the legislature recognized that the Constitution did not explicitly state what would happen if the IRC failed to deliver maps and implementing legislation. To

address that lack of clarity, the legislature placed an additional constitutional amendment on the 2021 ballot that would authorize the legislature to introduce its own redistricting legislation if the IRC failed to vote on any plan or implementing legislation by the deadline (2021 NY Senate-Assembly Concurrent Resolution S515, A1916). Voters rejected the proposed amendment by a margin of just over a quarter of a million votes. Upon the failure of the 2021 constitutional amendment, the legislature enacted a statute authorizing the legislature to create its own districts if the IRC failed to deliver maps and implementing legislation—the same remedy the voters had rejected (*see* L 2021, ch 633 [hereinafter the 2021 legislation]). The statute provided that if the IRC "does not vote on any redistricting plan or plans, for any reason, by the date required for the submission of the plan, [then] the [IRC] shall submit to the legislature all plans in its possession, both completed and in draft form, and the data upon which such plans are based" and "each house shall introduce such implementing legislation with any amendments each house deems necessary" (*id.* § 1).

The IRC submitted its first redistricting plan to the legislature on January 3, 2022, twelve days before its January 15, 2022 deadline (*see Harkenrider*, 38 NY3d at 504; NY Const, art III, § 4 [b]). Because the IRC had reached an impasse and was unable to reach a seven-person quorum as specified in the Constitution (*see* NY Const, art III, § 5-b [f]), the first submission consisted of two competing maps that had garnered equal support (*see Harkenrider*, 38 NY3d at 504; NY Const, art III, § 5-b [g]). On January 10, 2022, the legislature rejected both maps, triggering the IRC's constitutional obligation to prepare and submit a second redistricting plan within 15 days but in no case later than February 28, 2022 (*see Harkenrider*, 38 NY3d at 504; NY Const, art III, § 4 [b]). On January 24, 2022—

one day before the 15-day deadline and well before the February 28 deadline—two different factions of the IRC publicly released dueling statements reflecting that the body was deadlocked, with one faction declaring that the IRC would not be submitting a second plan to the legislature (*see Harkenrider*, 38 NY3d at 504-505). Neither faction consisted of a seven-person quorum. Shortly thereafter, relying on the 2021 legislation, the legislature introduced and passed its own redistricting maps, which the Governor signed into law on February 3, 2022 (*see* 2022 NY Senate-Assembly Bill S8196; 2022 NY Senate-Assembly Bill S8172A, A9039A; 2022 NY Senate-Assembly Bill S8197, A9168; 2022 NY Senate-Assembly Bill S8185A, A9040A).

The *Harkenrider* litigation commenced immediately. The *Harkenrider* petitioners sued the state legislature, alleging that the February 3 maps were procedurally and substantively unconstitutional. The *Harkenrider* petitioners argued that the 2021 legislation authorizing the legislature to create its own maps in the event of the IRC's dereliction was unconstitutional, and that because the February 3 maps were enacted pursuant to that statute, they had to fall with it. Because the legislature could not "contravene the Constitution's exclusive process for redistricting in New York through legislative enactment," the *Harkenrider* petitioners argued that the 2022 congressional and state senate maps should be declared invalid; that the Court could not give the "Legislature another opportunity to draw curative districts"; and instead the "Court should draw its own maps for Congress and state Senate prior to the upcoming deadlines for candidates to gain access to the ballot, just as happened regarding the 2012 congressional map."

On April 27, 2022, we held that the 2021 legislation was "unconstitutional to the extent that it permit[ted] the legislature to avoid" compliance with the bipartisan IRC process, a "central requirement of the [redistricting] reform amendments" (*Harkenrider*, 38 NY3d at 517). We further held that "the legislature and the IRC deviated from the constitutionally mandated [redistricting] procedure"; a deviation which required invalidation of the congressional and state senate maps (*id.* at 509; 511). We concluded that "judicial oversight [wa]s required to facilitate the expeditious creation of constitutionally conforming maps for use in the 2022 election and to safeguard the constitutionally protected right of New Yorkers to a fair election" (*id.* at 502). We then remitted the matter to Supreme Court to adopt, with the assistance of a special master, constitutional maps "with all due haste" following any "submissions from the parties, the legislature, and any interested stakeholders who wish to be heard" (*id.* at 523, 524). Less than a month later, Supreme Court certified the maps prepared by a special master as "the official approved 2022 Congressional map and the 2022 State Senate map" (*Harkenrider v Hochul*, 2022 NY Slip Op 31471[U], *1, *3, *4 [Sup Ct, Steuben County 2022]).

Five weeks later, on June 28, 2022, petitioners—ten registered New York voters uninvolved in the *Harkenrider* litigation—commenced this CPLR article 78 proceeding seeking a writ of mandamus to compel the IRC "to 'prepare and submit to the legislature a second redistricting plan and the necessary implementing legislation for such plan' as is required by Article III, sections 4 and 5 (b) of the New York Constitution in order to ensure a lawful congressional plan is in place immediately following the 2022 elections and can be used for subsequent elections this decade." Relying on *Harkenrider*, petitioners argued

that the IRC failed to comply with its constitutional duty to submit to the legislature a second redistricting plan. According to petitioners, the IRC continues to have that obligation, even though the 2022 congressional map was judicially adopted.

Three IRC members (hereinafter the Jenkins Respondents) answered, indicating that they did not oppose the specific mandamus relief sought by petitioners. Five other IRC members (hereinafter the Brady Appellants) moved under CPLR 3211 (a) (5) and (7) to dismiss the petition, asserting it failed to state a claim, mandamus to compel does not lie, and that the claim is barred by the statute of limitations. The Brady Appellants argued that February 28, 2022 was the last lawful date on which the IRC could have submitted to the legislature a second redistricting plan, thus petitioners sought to compel the IRC to perform an unconstitutional act. They further argued that a court-ordered redistricting plan was the exclusive remedy for a violation of the redistricting process and that, because the constitutionally prescribed remedial process had played out in *Harkenrider*, the resulting maps could not be redrawn until after the 2030 census. Finally, the Brady Appellants argued that petitioners' mandamus claim accrued when the IRC announced its deadlock on January 24, 2022, which rendered this proceeding barred by the four-month limitations period contained in CPLR 217.

The *Harkenrider* intervenors—fourteen New York voters who had participated in the earlier *Harkenrider* litigation (hereinafter the Harkenrider Intervenors)— intervened in this proceeding and moved to dismiss the petition on three grounds. First, they argued that this proceeding constitutes an impermissible collateral attack on the *Harkenrider* judgment. Second, they argued that the mandamus relief requested by petitioners would

violate the New York Constitution because once the IRC failed to discharge its obligations, the only constitutionally permissible remedy is the judicial creation of maps, which was fully accomplished by Supreme Court in May 2022. Third, they argued that this proceeding is untimely because it was not commenced between January 24, 2022—the date on which the IRC "declared its decision to violate its constitutional duties"—and February 28, 2022, when "the IRC's authority to submit [second proposed] maps expired."

Supreme Court granted the motions and dismissed the petition. The court held that petitioners' claim was timely because it accrued on May 20, 2022—when the 2022 congressional map was certified by Supreme Court—and thus was well within the four-month statute of limitations. However, the court dismissed the petition on the ground that the congressional map certified in May 2022 was to remain in full force and effect until the next redistricting cycle. Petitioners appealed.

With two Justices dissenting, the Appellate Division reversed Supreme Court's judgment on the law and granted the petition. The court held that this proceeding was commenced "well within" the four-month statute of limitations, reasoning that the mandamus claim accrued when the 2021 legislation was deemed unconstitutional by Supreme Court on March 31, 2022 (*Matter of Hoffmann v New York State Ind. Redistricting Commn.*, 217 AD3d 53, 58 [3d Dept 2023]). The court then declined to infer, in "the complete absence of an explicit direction" in our opinion in *Harkenrider*, that the resulting court-drawn districts were intended to apply beyond the 2022 election (*id.* at 60). As a result, the court held that *Harkenrider* did not foreclose the requested mandamus relief

and that petitioners had a clear legal right to the mandamus relief sought. The court therefore ordered the IRC to "commence its duties forthwith" (*id.* at 62).

The Brady Appellants and Harkenrider Intervenors appealed as of right (*see* CPLR 5601 [a]). They subsequently asserted that an automatic stay under CPLR 5519 (a) (1) was in place and the IRC was therefore precluded from working toward the submission of a second redistricting plan during the pendency of appeals. Petitioners moved for a determination that the automatic stay did not apply or, in the alternative, to vacate or modify the stay to permit "the IRC to meet and discuss the upcoming map-drawing process, draft maps, and take any other steps necessary to swiftly comply with the Appellate Division's order should this Court affirm." On September 19, 2023, we held that the Appellate Division's order was automatically stayed pursuant to CPLR 5519 (a) (1), denied the motion to vacate the stay, and clarified that the automatic stay of the Appellate Division's order did not "prohibit the IRC or its members from taking any actions" (*Matter of Hoffmann v New York State Ind. Redistricting Commn.*, 40 NY3d 968 [2023]).

## II.

A simple and straightforward proposition disposes of most of the issues the parties have raised. The plain text of the 2014 amendments to the Constitution places express limitations on court-drawn maps. Following the enactment of the 2014 amendments, New York courts no longer have the blanket authority to create decade-long redistricting plans. Instead, the Constitution now limits court-drawn redistricting to the minimum required to remedy a violation of law. Article III, section 4 (e), enacted as part of the 2014 constitutional amendments, reads:

"The process for redistricting congressional and state legislative districts established by this section and sections five and five-b of this article shall govern redistricting in this state *except to the extent that a court is required* to order the adoption of, or changes to, a redistricting plan as a remedy for a violation of law. A reapportionment plan and the districts contained in such plan *shall be in force* until the effective date of a plan based upon the subsequent federal decennial census taken in a year ending in zero *unless modified pursuant to court order*" (NY Const, art III, § 4 [e] [emphasis added]).

Thus, the 2014 constitutional amendments place an explicit limitation on court-created maps. Permitting a judicially created redistricting to last longer than "required" would read the words "to the extent that a court is required" out of the Constitution. Both the dissent and appellants would have us read the Constitution as if it said, instead, that the IRC process "shall govern except if a court orders the adoption of, or changes to, a redistricting plan." But that is not what the Constitution says.

The dissent contends that we have erred grammatically—that " 'to the extent . . . required' does not modify the courts' power 'to order the adoption of, or changes to, a redistricting plan as a remedy for a violation of law'—it modifies the subject of the sentence, which is '[t]he process for redistricting . . . established by [§§ 4, 5, § 5-b] shall govern' " (dissenting op at 20). As a grammatical matter, the limiting language is annexed to the clause describing what the courts may do, not what the IRC must do. As a commonsense matter, language directed at the scope of a court-ordered remedy necessarily relates to the courts, not the IRC. What that passage, quoted in full in the text above, clearly states is that the IRC process for creating districts "*shall govern* redistricting in this state except to the extent that a court is required to order the adoption of, or changes to, a

redistricting plan as a remedy for a violation of law" (NY Const, art III, § 4 [e] [emphasis added]).  The Constitution clearly establishes the IRC process as predominant over court-drawn districts.

"To the extent" and "required" are limiting words that cannot be disregarded.  Those words permit court-drawn redistricting only "to the extent" it is "required" to remedy a violation of law.  Otherwise, the Constitution requires the IRC map-drawing process.  When applied to the maps made pursuant to *Harkenrider*, section 4 (e) authorized the Steuben County Supreme Court to fashion maps to the "extent" it was "required" to do so.  Given the impending 2022 election cycle, Supreme Court was "required" to alter the IRC-based redistricting process for that imminent election cycle—and to that "extent" alone.  Indeed, Supreme Court quite properly identified the maps pursuant to *Harkenrider* as the "official approved 2022 Congressional map" (*Harkenrider*, 2022 NY Slip Op 31471[U], *3, *4).  The Appellate Division reached this same conclusion (*see Hoffmann*, 217 AD3d at 60).  In short, section 4 (e) requires a nexus between the violation and the judicial remedy, and a court cannot adopt a remedy beyond what is necessary to cure the violation of law.

Appellants cannot explain why their interpretation does not render those words superfluous.  They offer no alternative meaning for them, and none is apparent.[4]  We have

_____

[4] Our dissenting colleagues offer that the words "except to the extent that a court is required to order the adoption of, or changes to, a redistricting plan as a remedy for a violation of law" merely "clarifies that the IRC and legislature must comply with the deadlines, voting requirements, and other procedural rules set forth in the referenced constitutional provisions" and "reaffirms . . . the courts' traditional power to remedy violations of law" (dissenting op at 21).  Of course, that reading renders the limiting clause as wholly

long and repeatedly held that "in construing the language of the Constitution as in construing the language of a statute, the courts should look for the intention of the People and give to the language used its ordinary meaning" (*Sherrill*, 188 NY at 207). The " 'starting point for discerning legislative intent is the language of the statute itself' " (*Matter of Lynch v City of New York*, 40 NY3d 7, 13 [2023], quoting *Matter of DaimlerChrysler Corp. v Spitzer*, 7 NY3d 653, 660 [2006]), such that the " 'literal language of a statute controls' " (*Lynch*, 40 NY3d at 13, quoting *Matter of Anonymous v Molik*, 32 NY3d 30, 37 [2018]). All parts of the constitutional provision or statute " 'must be harmonized with each other as well as with the general intent of the whole statute, and effect and meaning must, if possible, be given to the entire statute and every part and word thereof' " (*People v Pabon*, 28 NY3d 147, 152 [2016], quoting McKinney's Cons. Laws of N.Y., Book 1, Statutes § 98 [a]). Indeed, our well-settled doctrine requires us to give effect to each component of the provision or statute to avoid " 'a construction that treats a word or phrase as superfluous' " (*Columbia Mem. Hosp. v Hinds*, 38 NY3d 253, 271 [2022], quoting *Matter of Lemma v Nassau County Police Officer Indem. Bd.*, 31 NY3d 523, 528 [2018]).

Appellants' failure to offer any other meaning for the words "to the extent that a court is required" properly ends any analysis. Instead of offering any other possible

---

superfluous. Under the dissent's reading, striking "to the extent that a court is required" would change neither the IRC's nor the legislature's duties, nor alter the courts' power of review. It is also a quite tortured reading to say that words limiting the power of courts are meant as a direction to the IRC and legislature.

meaning, both the dissent and appellants point to the next sentence of section 4 (e), which provides that reapportionment plans last for a decade (*see* dissenting op at 21). However one reads that sentence, it does not explain what meaning should be ascribed to the words "to the extent that a court is required." Furthermore, that second sentence of 4 (e) bolsters our plain reading of the prior sentence, rather than refutes it. The second sentence reads: "A reapportionment plan and the districts contained in such plan shall be in force until the effective date of a plan based upon the subsequent federal decennial census taken in a year ending in zero *unless modified pursuant to court order*" (NY Const, art III, § 4 [e] [emphasis added]). The clause beginning with "unless" specifies that plans modified pursuant to a court order—unlike plans created by the IRC process—might not last until the next federal decennial census.[5] Far from contradicting the plain reading of the first sentence that cabins a court's power to conduct redistricting, the second sentence is completely in harmony with the first. A reading that gives a consistent meaning to both must be accepted in preference to a reading that renders words superfluous.[6]

---

[5] Additionally, based on the context and placement of section 4 (e), the "reapportionment plan" mentioned therein is the plan created by the IRC and, if necessary, the legislature, not court-drawn districts—the entirety of section 4, which concludes with section 4 (e), sets forth the IRC redistricting process in detail.

[6] Appellants, though not the dissent, also contend that "modified" in the second sentence of section 4 (e) means only "minor change" or "small change" or "somewhat different." From that, appellants posit that the exclusion beginning with "unless" in that sentence applies only to minor court-ordered changes, and not to the adoption of a complete set of maps created by court order. That argument is not tenable. Under section 4 (e) (and also as an indisputable proposition of law), modifications must be whatever "a court is required to order . . . as a remedy for a violation of law" (NY Const, art III, § 4 [e]). The law might

Appellants and our dissenting colleagues also contend that mid-decade redistricting is disfavored, observing that the 2014 amendments prohibit mid-decade redistricting because the state of Texas deemed as such under its constitution and Congress is considering, but has not acted on, legislation to that effect (dissenting op at 22-23). Putting aside that any such general preference cannot supersede the language of the Constitution, section 5-b (a), which itself is part of the 2014 constitutional amendments, expressly contemplates that a court may issue orders directing an IRC to redo IRC-created or legislatively created districts mid-decade, even though section 4 (e) specifies that such districts are expected to last for a decade.

Section 5-b (a) states, in part:

> "On or before February first of each year ending with a zero *and at any other time a court orders* that congressional or state legislative districts *be amended*,[7] an independent redistricting commission shall be established to determine the district lines for congressional and state legislative offices" (NY Const, art III, § 5-b [a] [emphasis added]).

Thus, although not applicable to the judicially created districts involved on this appeal, section 5-b (a) further refutes both the dissent's and appellants' argument that the Constitution prohibits mid-decade redistricting.

---

require something drastic or minor, yet whatever is required is the "modification," whether minor or drastic.

[7] As with "modified," appellants would have us read "amended" as limited to small changes. But amendments can be large or small. In any redistricting, the party responsible for the redistricting starts with the preexisting districts and asks what needs to be changed, which fits neatly within the definition of "amended."

Moreover, in the instant proceeding, petitioners are not requesting a court-ordered amendment to any districts. Instead, they have asked the court to issue a writ of mandamus compelling the IRC to deliver to the legislature a second set of maps and implementing legislation. The legislature may adopt those maps, or it may modify them as provided for in the Constitution (and as further constrained by the accompanying legislation). Either way, maps drawn pursuant to our decision will not be maps "ordered" by a court— rather, they will, one way or another, be adopted by the IRC and legislature.

Although the constitutional language is clear, the background against which the constitutional provisions were implemented further supports the conclusion that the Constitution limits court-drawn maps to the minimum time and scope required to cure a violation of law. For more than half a century before the 2014 constitutional amendments, every New York legislative redistricting was subject to court intervention, including the imposition of a judicially created congressional plan in 2012. The People adopted the 2014 amendments creating the IRC against that background and did so because of the frustration over both the legislature's inability to draw lawful districts and the continual requests for districts to be created by the courts. In light of that history, it does not make sense to read the constitutional amendments to require a court to create decade-long electoral districts if the IRC or legislature fails to carry out its constitutional duties.

Court-drawn judicial districts are generally disfavored because redistricting is predominantly legislative. As the U.S. Supreme Court has explained, "our decisions have assumed that state legislatures are free to replace court-mandated remedial plans by

enacting redistricting plans of their own. . . . Underlying this principle is the assumption that to prefer a court-drawn plan to a legislature's replacement would be contrary to the ordinary and proper orientation of the political process" (*League of United Latin Am. Citizens v Perry*, 548 US 399, 416 [2006]; *see id.* ["(D)rawing lines for congressional districts is one of the most significant acts a State can perform . . . (a)s the Constitution vests redistricting responsibilities foremost in the legislatures of the State and in Congress, a lawful, legislatively enacted plan should be preferable to one drawn by the courts"]; *see also Perry v Perez*, 565 US 388, 392 [2012] [emphasizing that "(r)edistricting is 'primarily the duty and responsibility of the State' " and consistently referring to courts required to take up the state legislature's task as creating, drafting, or devising an "interim map"]; *Wise v Lipscomb*, 437 US 535, 540 [1978] ["(I)t is . . . appropriate, whenever practicable, to afford a reasonable opportunity for the legislature to meet constitutional requirements by adopting a substitute measure rather than for the federal court to devise and order into effect its own plan"]; *Reynolds v Sims*, 377 US 533, 586 [1964] [redistricting is "primarily a matter for legislative consideration and determination"]).[8]    Given this strong and

---

[8] We would not be the first state court to order recommencement of a nonjudicial redistricting process mid-decade following the judicial adoption of maps.  As petitioners point out, other states' high courts have recognized in similar circumstances that when a redistricting body "fails to enact a new redistricting plan [within the timeframe provided by the state constitution], it is neither deprived of its authority nor relieved of its obligation to redistrict" (*In re Below*, 855 A3d 459, 462 [NH 2004 per curiam]; *see also Lamson v Secretary of Commonwealth*, 341 Mass 264, 273 [Mass 1960] [although the failure of the redistricting body to act "thwarts the intention of the Constitution," an "even more serious nullification of constitutional purpose will result under a construction which would" prohibit a redistricting body from "return[ing] to reapportion"]; *Harris v Shanahan*, 192 Kan 183, 213 [Kan 1963] ["(T)he duty to properly apportion legislative districts is a continuing one, imposed by constitutional mandate upon the legislature, notwithstanding

longstanding body of federal law, it makes complete sense that the 2014 constitutional amendments were drafted to prohibit court-ordered redistricting "except to the extent that a court is required to order the adoption of, or changes to, a redistricting plan as a remedy for a violation of law" (NY Const, art III, § 4 [e]). The 2014 constitutional reforms unambiguously promised New York's citizens an IRC redistricting process with minimal resort to court-drawn districts—only to the extent required to remedy a violation of law.

### III.

Because we conclude that the Constitution limits the redistricting power of the courts—including our Court—to the creation of interim districts as the proper means to correct the extant constitutional failure, determining whether *Harkenrider* commanded the creation of a decade-long redistricting plan is wholly irrelevant and simply an academic exercise. Even if *Harkenrider* could be read to have required or allowed Supreme Court to create decade-long court-drawn districts, that reading would run afoul of the Constitution. In other words, if that is what *Harkenrider* intended, it lacked authority to do so because that remedy would have been unnecessary to cure the constitutional violation. Thus, reading the *Harkenrider* tea leaves—which all parties have attempted to do, each claiming something in that writing supports one position or the contrary—is meaningless given our holding today.

---

the failure of any previous session to make such a lawful apportionment, and this duty may be performed prior to commencement of the next pending electoral process . . . "]).

In any event, *Harkenrider* is silent about the duration of the remedy. Although there are points that could be read to suggest that the remedy was limited to the 2022 election,[9] it is possible to read some of them as neutral or cutting the other way. Even the passage on which appellants most heavily rely—beginning with the observation that "[t]he procedural unconstitutionality of the congressional and senate maps is, at this juncture, incapable of a legislative cure"—suggests that the decision was limited to the exigency caused by the impending 2022 election, hence the inclusion of the words "at this juncture" (*Harkenrider*, 38 NY3d at 523). Although appellants contend that ordering the IRC to produce maps in *Harkenrider* would have been quicker than ordering judicially created districts, that contention misses two important points. First, Supreme Court accomplished the redistricting in two months. Second, no party in *Harkenrider* sought to compel the IRC to act, the IRC was not a party to the proceeding, and ordering the IRC to deliver maps would still have left those maps subject to legislative or gubernatorial disapproval and further mapmaking by the legislature, with the historically attendant litigation to follow.

---

[9] *Harkenrider* starts off with a declaration that judicial oversight was required to facilitate the "expeditious creation of the constitutionally conforming maps for use in the *2022* election" (38 NY3d at 502 [emphasis added]; *see also id.* at 521 [reiterating that the state was left "without constitutional district lines for use in the *2022* primary and general elections" (emphasis added)]). In addition, our Court highlighted the urgency and underlying exigency constraining our 2022 remedy because the maps were "incapable of legislative cure" at "this juncture" (*id.* at 523). In combination with the plain text of the Constitution, our time-specific language and emphasis on the exigency of the then-fast-approaching 2022 election cycle, one could read *Harkenrider* as ordering an interim set of maps. But again, that line of reasoning is hardly conclusive, especially given this Court's silence on that issue.

Regardless, because the 2014 constitutional amendments limited court-ordered districts to only what is required to remedy a violation of law, *Harkenrider* cannot be read to hold that courts may create decade-long redistrictings or that we ordered Supreme Court to do so. Accordingly, the existing judicially drawn congressional districts are limited to the 2022 election.[10]

IV.

Petitioners' writ of mandamus proceeding is timely and not barred by laches. Petitioners filed a special article 78 proceeding in the form of a writ of mandamus to compel the IRC to submit a second set of congressional maps once the exigency of the 2022 elections had passed. Mandamus to compel lies where an administrative body has failed to perform a duty enjoined upon it by law, the performance of that duty is mandatory and ministerial rather than discretionary, and there is a legal right to the relief sought (*see* CPLR 7801 [1]; *New York Civ. Liberties Union v State of New York*, 4 NY3d 175, 184 [2005]; *see also Klostermann v Cuomo*, 61 NY2d 525, 540 [1984] [explaining that the "function of mandamus (is) to compel acts that officials are duty-bound to perform"]). Under CPLR

---

[10] Of course, if no one challenges the continued use of a judicially created redistricting, it will remain in place by default. But if, for example, a challenge is brought that does not leave enough time for the IRC to act, that challenge may be subject to a laches defense or a court may determine, as we did in *Harkenrider*, that the IRC or legislative processes may be too fraught with delay to prove feasible "at that juncture", and a further court-ordered remedy is required. Our holding today in no way "eliminat[es] . . . judicial review" (dissenting op at 24). Quite to the contrary, by granting a writ of mandamus to compel the IRC to fulfill its constitutional duty, we are asserting the power of the judiciary to ensure compliance with the will of the People of New York, as set forth in the constitutional provision they adopted—not "diminish[ing] the judiciary's role and power" (*id.*).

article 78, a writ of mandamus to compel governmental bodies or officers "must be commenced within four months . . . after the respondent's refusal, upon the demand of the petitioner or the person whom he represents, to perform its duty" (CPLR 217 [1]; *see Austin v Board of Higher Educ.*, 5 NY2d 430, 442 [1959] [where the relief sought is in the nature of a mandamus to compel, the "aggrievement does not arise from the final determination but from the refusal of the body or officer to act or perform a duty enjoined by law"]). It is therefore necessary to make a "demand and await a refusal before bringing a proceeding in the nature of mandamus," wherein the statute of limitations does not run out until "four months after the refusal" (*id.*; *see Matter of Bottom v Goord*, 96 NY2d 870, 872 [2001]; *see also Donoghue v New York City Dept. of Educ.*, 80 AD3d 535, 536 [1st Dept 2011]).

In an appropriate case, the filing of a petition and the answer thereto is one way to establish a "demand" and a "refusal" for the purposes of a mandamus proceeding (*see Matter of Thomas v Stone*, 284 AD2d 627, 628 [3d Dept 2001]; *Matter of Speis v Penfield Cent. Schs.*, 114 AD3d 1181, 1182-1183 [4th Dept 2014]; *Matter of Meegan v Griffin*, 161 AD2d 1143, 1143 [4th Dept 1990], *lv denied* 76 NY2d 710 [1990], *rearg denied* 67 NY2d 1018 [1990]). Petitioners filed a complaint on June 28, 2022, whereupon the Brady Appellants moved under CPLR 3211 (a) (5) and (7) to dismiss, constituting a refusal. Thus, the petitioners demanded the IRC to act, and the IRC refused. Because the filing of the complaint and the IRC's subsequent refusal to act began the running of the period, this

proceeding is decidedly within the four-month limitation period prescribed by CPLR 217 (1).[11]

Appellants, our dissenting colleagues, and the Appellate Division dissenting Justices do not dispute that the Constitution requires the IRC to conduct redistricting but contend that the time to compel the IRC to act has passed. The insuperable problem with their argument is that they have assumed that the court-ordered maps last for the decade. Because they do not, the time to move for a writ of mandamus to compel the IRC to complete its constitutional function as to the remaining elections in this decade has not yet passed. Indeed, it could not have commenced until we ordered Supreme Court to draw its own districts as a remedy. Put differently, because the Constitution requires the IRC to draw districts, if a court has drawn districts, the IRC's constitutional obligation may be enforced at any time unless barred by laches (which, for example, would bar a challenge made insufficiently ahead of the next election cycle to permit the IRC to perform its constitutional function). Effectively, the untimeliness argument is nothing more than a way to undo the constitutional requirement that the court-drawn maps be only what is necessary to cure the violation: by requiring any challenge to be made only at the IRC's initial failure, appellants and our dissenting colleagues would cause court-ordered districts

---

[11] Appellants repeatedly cite footnote 10 of *Harkenrider* as "confirm[ing] th[e] accrual date" for a mandamus action as January 25, 2022. Neither the footnote nor the text calling it make any mention of an accrual date or January 25. Instead, with no reference whatsoever to timeliness, the footnote lists a mandamus action among several methods that might be used to compel IRC members "either to appear at IRC meeting or to otherwise perform their constitutional duties" (38 NY3d at 515 n 10). That is precisely the relief sought and granted in this appeal.

to last a decade.  Because the Constitution says otherwise, mandamus to compel the IRC to complete its constitutional function now, is timely.

Nor is the petition barred by laches.  When laches "is invoked in an article 78 proceeding in the nature of mandamus, proof of unexcused delay without more may be enough" (*Matter of Sheerin v New York Fire Dept. Articles 1 and 1B Pension Funds*, 46 NY2d 488, 495-496 [1979]).  It is the unreasonable nature of a delay that might constitute laches in such proceedings: "laches is designed to introduce flexibility into the process of determining when rights have been asserted so unseasonably that a point at which they should be barred has been reached" (*id.*).  Citing various Appellate Division decisions arising in quite different contexts but disregarding the import of our own decision in *Sheerin*, our dissenting colleagues assert that the laches period can be no greater than the four-month limitations period in CPLR 217 (1) (dissenting op at 10).  Here, however, laches has no application.  Petitioners are seeking to compel the IRC to send maps to the legislature, as required in the Constitution, to replace the court-drawn maps that are limited to the 2022 elections.  They have done so in a more than timely fashion.

As we explained in *Sheerin*, laches in this context functions "as the counterpart of a Statute of Limitations, to which it may be analogized *but to whose provisions it owes no necessary obeisance*" (46 NY2d at 496 [emphasis added]).  We pointedly rejected as "too broad an assertion" the proposition that the point at which laches may attach cannot "cover

a period longer or shorter than that prescribed by any available Statute of Limitations" (*id.*).[12]

Petitioners filed this proceeding on June 28, 2022. The petition was filed two months and one day after we decided *Harkenrider*, in which we held the 2021 gap-filling legislation unconstitutional and that a court-ordered redistricting plan must be implemented to the extent required to remedy the legislature's violation of law. Because the Constitution forbade those court-drawn plans from lasting longer than necessary, our *Harkenrider* decision marks the date on which petitioners' right to make the demand of IRC arose and when petitioners knew or should have known of the facts that gave them a clear legal right to relief.

Moreover, as we observed in *Sheerin*, the question for the application of laches is not whether the delay exceeded four months, but whether the time at which the demand was made was reasonable in the circumstances. Here, petitioners are seeking to compel the IRC to act in the future, and the date on which they made a demand was early enough to allow for this proceeding to work its way through the courts with a determination made in time for the IRC to act in advance of the deadlines set forth in the Constitution ahead of the upcoming elections. Given these circumstances, making a demand on June 28, 2022 is hardly unreasonable. We therefore see no basis to impose a laches bar to prevent the citizens of New York from having districts drawn as the Constitution commands.

---

[12] *Sheerin* states that the laches period may be "*longer* or shorter" than the statute of limitations (46 NY2d at 496 [emphasis added]), yet the dissent reads it as if "longer or" is missing from that opinion (*see* dissenting op at 16 n 2).

V.

Indisputably, the Constitution requires the IRC to deliver a second set of maps and implementing legislation to the legislature. The court-drawn maps directed by our *Harkenrider* decision may exist only to the extent required to remedy the violation of law at issue in that appeal. They are not now necessary to remedy the continuing violation of law asserted on this appeal, because the IRC has more than sufficient time to complete the constitutionally required process—time it did not have in late April 2022.

The *Harkenrider* litigation did not seek to remedy the violation caused by the IRC's failure to fulfill its constitutional obligation. Indeed, the obligation that now exists did not exist at that time due to the presence of the gap-filling legislation, which allowed for an alternative statutory path to redistricting in the event that the IRC deadlocked or otherwise failed to deliver maps. Instead, the *Harkenrider* petitioners attacked as unconstitutional the legislature's 2021 gap-filling legislation, and the redistricting created by the legislature under that statutory authorization on both procedural and substantive grounds. Even though the *Harkenrider* and *Hoffmann* proceedings share some common background, the two are legally different. As the Appellate Division observed, "*Harkenrider* addresses the IRC's inaction solely by way of factual background" (*Hoffmann*, 217 AD3d at 61). In that same vein, no party in *Harkenrider* sued the IRC to compel it to act consistently with its constitutional duties. Indeed, the IRC and its members were not a party to it (*see Harkenrider*, 38 NY3d at 552 [Rivera, J., dissenting] [petitioners "did not sue the IRC to secure compliance with what they and the (Court's) majority maintain(ed) is the '*exclusive method of redistricting*'" (quoting majority op)]).

Thus, our dissenting colleagues' complaints about the failure to adhere to *stare decisis* are meritless (dissenting op at 18, 20 n 3). *Harkenrider* is silent as to the duration of the maps; the decision does not discuss any interpretation of section 4 (e), and no party advanced any argument about its meaning. It is surely a novel proposition to urge that a court is "derelict" for failing to address an argument no one advanced (*see id.* at 19), or that we are "eager[] to relitigate" an issue that the dissent concedes no party in *Harkenrider* raised and as to which *Harkenrider* is silent (*id.* at 20 n 3). Rather, it is hornbook law that "[a] judicial opinion . . . must be read as applicable only to the facts involved, and is an authority only for what is actually decided" (*Rolfe v Hewitt*, 227 NY 486, 494 [1920]). Indeed, the doctrine of *stare decisis* presupposes the existence of binding precedent, yet issues that have never been addressed nor squarely decided certainly cannot bind future courts (*see Matter of Empire Ctr. for N.Y. State Policy v New York State Teachers' Retirement Sys.*, 23 NY3d 438, 446 [2014] ["Our decisions are not to be read as deciding questions that were not before us and that we did not consider"]).

It follows then that the Harkenrider Intervenors' collateral attack argument likewise fails. Because the instant proceeding revolves around a distinct and previously unraised issue—the interpretation of section 4 (e)'s language limiting judicial redistricting "except to the extent that a court is required to order the adoption of, or changes to, a redistricting plan as a remedy for a violation of law"—none of the claims or issues raised in this mandamus proceeding is addressed (much less barred) by our prior decision.[13] The

---

[13] For the same reason, and contrary to the Harkenrider Intervenors' argument, this proceeding was properly brought in Albany. The petition does not seek a modification of

Harkenrider Intervenors' collateral attack argument thus fails because the judicial redistricting ordered by our *Harkenrider* decision cannot constitutionally last longer than necessary to remedy a violation of law. It therefore can have no preclusive effect on future legislative redistricting, except insofar as the redistricting plan we struck down as substantively unconstitutional may have some bearing in any evaluation of the substantive constitutionality of a future redistricting plan.

Accordingly, mandamus to compel lies. The People of New York are entitled to the process set out in the Constitution, for which they voted. That process may include a judicially directed creation of districts that is limited expressly to the "extent" that the court is "required" to do so (NY Const, art III, § 4 [e]), but not at the expense of the IRC process when time exists to follow that process. There is no good argument as to why New Yorkers must be prohibited from ordering the creation of legislative districts through the process the Constitution requires, adopted by the direct vote of the People. Underlying all the dissent's rhetoric is a complaint that this Court is forcing the IRC and legislature to follow the Constitution.

Reduced to its essence, the dissent's and appellants' arguments are that we should not pursue the IRC process because it will never work: ordering the IRC to deliver the required maps and implementing legislation will produce gamesmanship, a never-ending

---

a prior court order of the Steuben County Supreme Court. Instead, it seeks to compel the IRC to deliver maps. New maps will supplant the judicially created maps not by judicial modification of Supreme Court's order, but rather by operation of the IRC and legislative process as provided for in the Constitution.

cycle of litigation, and ensure that "politics triumphs over free and fair elections" (dissenting op at 27). But that is precisely what New York faced for decades before the 2014 constitutional amendments and it was the very reason the IRC process was adopted. To allow the IRC to defeat the Constitution encourages gamesmanship and defeats the popular will. Indeed, if we allow the IRC's lack of compliance to stand, we would incentivize the same conduct that deadlocked the IRC and led to court-ordered redistricting.

Compelling the IRC to commence its constitutional duty will not re-open the door to future mid-decade challenges. Instead, once the IRC has submitted a second set of lawful redistricting maps adopted by the legislature, those maps would remain in place through the end of the decade. That, in turn, would send a clear directive to the IRC in subsequent decades that it must comply with the Constitution. In any event, debates about gamesmanship are better addressed to the voters, who can repeal or modify the IRC process if it proves undesirable. Until such time, however, it is our obligation to enforce the constitutional process, not give up on it because of a judicial judgment that it was ill-advised.

We note the irony in the dissent's claim that, by compelling the IRC and legislature to comply with the Constitution, we are "restrict[ing] . . . judicial authority" (dissenting op at 25), or that because the courts may again have to hold the IRC to its constitutional obligations, we are diminishing the role of the judiciary (*id.* at 24). Instead, "the judicial department of the government is charged with the solemn duty of enforcing the Constitution . . . [and] the responsibility of correcting every possible abuse arising from the exercise by the other departments of their conceded authority" (*McCray v United States*,

195 US 27, 53-54 [1904]). We are holding the IRC and legislature to what the Constitution demands and will do so as often as necessary to secure compliance with its mandate. That said, we trust that the members of the IRC will act as the Constitution requires without further need for judicial intervention. After all, the IRC members, like us, may not ignore our respective constitutional duties.

VI.

Consistent with our opinion and the Appellate Division's direction, the IRC should comply with its constitutional mandate by submitting to the legislature, on the earliest possible date, but in no event later than February 28, 2024, a second congressional redistricting plan and implementing legislation.[14] Accordingly, the order of the Appellate Division should be affirmed, with costs.

---

[14] This redistricting process must be based on the 2020 census data, which the IRC has already compiled, and there is no requirement that the IRC conduct any solicitation of public commentary beyond what it has done previously.

CANNATARO, J. (dissenting):

Less than a decade ago, the People of this State amended the New York Constitution to mandate that partisanship be kept out of the decennial redistricting process (*see* NY Const, art III, § 4 [c] [5]). At their first opportunity, the Independent Redistricting Commission (IRC) and legislature failed to follow the constitutional process for enacting

- 1 -

redistricting legislation and disobeyed the Constitution's anti-gerrymandering mandate, requiring this Court to act (*see Matter of Harkenrider v Hochul*, 38 NY3d 494, 501 [2022]). Redistricting plans were drafted by a neutral special master in accordance with our decision in *Harkenrider*, certified by Supreme Court*,* and then used in the 2022 election, producing a fair and competitive election consistent with the overarching goals of the 2014 constitutional reforms prohibiting gerrymandering.

Today, even though the constitutionality of the existing district lines has not been substantively challenged, the majority reverses course. Recasting the judiciary's long history of safeguarding New Yorkers' right to free and fair elections as the problem in need of correction—with political gerrymandering meriting barely any mention in the majority decision—the Court today strictly curtails the constitutional authority of the judiciary to remedy future legislative overreach, rewriting the Constitution in order to do so.

Under the plain language of the Constitution, the maps we ordered in *Harkenrider* must remain "in force until the effective date of a plan based upon the subsequent federal decennial census . . . unless modified pursuant to court order" to remedy a violation of law (NY Const, art III, § 4 [e]). Since the only violation of law alleged in this proceeding is the previous breakdown of the redistricting process this Court remedied in *Harkenrider*, there is no constitutional basis for this Court to order a new congressional map. The majority's holding to the contrary manufactures a new violation of law to justify overruling *Harkenrider*, rewards petitioners for their inexcusable and strategic delay in commencing this proceeding, and elevates a failed process above the People's substantive rights to free and fair elections. The majority is able to reach this result "for one reason and one reason

only: because the composition of this Court has changed" (*Dobbs v Jackson Women's Health Org.*, 597 US 215, 364 [2022] [Breyer, Sotomayor, and Kagan, JJ., dissenting]). I dissent.

I.

Adoption and Violation of the 2014 Constitutional Amendments

Partisan gerrymandering—the manipulation of district lines to favor a particular political party—is a practice that "debase[s] and dishonor[s] our democracy," "enable[s] politicians to entrench themselves in office as against voters' preferences," "promote[s] partisanship above respect for the popular will," and "encourage[s] a politics of polarization and dysfunction" (*Rucho v Common Cause*, 588 US ___, 139 S Ct 2484, 2509 [2019] [Kagan, J., dissenting]). As the majority recounts, redistricting in New York has been frustrated for decades by partisan gerrymandering and legislative stalemates. And history demonstrates that it was the judiciary that was called upon to guarantee fair elections to New Yorkers.

In 2014, following resolutions enacted by two successive legislatures and a ballot referendum approved by the People, amendments to the New York Constitution effected sweeping reform of the state's redistricting process by restraining the legislature's ability to enact gerrymandered maps, with the goal of ushering in a new era of bipartisanship. In 2019, however, Democrats captured a supermajority of both the state senate and the state assembly. In 2021, the new legislature sponsored a ballot initiative in which it proposed to amend the Constitution and grant itself the authority to draw maps if the IRC "for any reason" failed to carry out its constitutional duty to submit a redistricting plan to the

legislature (2021 NY Senate-Assembly Concurrent Resolution S515, A1916). New York voters firmly rejected that proposal by a 54-45% margin, reaffirming their commitment to bipartisanship and their opposition to legislative circumvention of the constitutional map-drawing process. Undeterred, the legislature promptly passed a statute to achieve the same result (the 2021 legislation) (*see* L 2021, ch 633).

Following passage of the 2021 legislation, negotiations between the IRC members broke down. Split along party lines, the IRC was unable to garner sufficient votes to submit a single set of maps by the constitutional deadline for its first-round proposal. As a result of their disagreements, the IRC submitted a dueling pair of redistricting plans to the legislature, one from each party delegation.[1]

On January 10, 2022, the legislature rejected this first round of IRC redistricting plans, thereby triggering the IRC's constitutional obligation to proffer a second round of maps "[w]ithin fifteen days of such notification" (NY Const, art III, § 4 [b]). The Constitution therefore mandated that the IRC proffer a second redistricting plan by January 25, 2022. Fourteen days later, the IRC publicly announced a deadlock and, on January 25th, the IRC's deadline came and went without the submission of second-round maps to the legislature.

Within a week, acting under color of the 2021 legislation, the legislature's supermajority composed and enacted its own set of congressional, senate, and assembly

---

[1] The submission of multiple redistricting plans is constitutionally permitted if a single consensus map fails to garner sufficient votes (*see* NY Const, art III, § 5-b [g]).

redistricting maps without any consultation or participation by the minority party (*see* 2022 NY Assembly Bill A9167, 2022 NY Senate Bill S8196, 2022 NY Assembly Bill A9039-A, 2022 NY Senate Bill S8172-A, 2022 NY Assembly Bill A9168, 2022 NY Senate Bill S8197, 2022 NY Senate Bill S8185-A, 2022 NY Assembly Bill A9040-A).  The congressional map, in particular, was universally derided by the press, legal experts, and good-government groups as an egregious partisan gerrymander (*see e.g.*, Nia Prater, *New York Democrats Have Gerrymandered Their Way to a Huge Advantage*, New York Magazine, Feb. 4, 2022, https://nymag.com/intelligencer/2022/02/n-y-democrats-gerrymandered-their-way-to-a-huge-advantage.html; Nicholas Fandos et al., *A 'Master Class' in Gerrymandering, This Time Led by N.Y. Democrats*, NY Times, Feb. 3, 2022, § A, page 1, https://www.nytimes.com/2022/02/02/nyregion/redistricting-gerrymandering-ny.html; Jane C. Timm, *New York Legislature Oks Gerrymander That Could Net Democrats 3 More Seats*, NBC News, Feb. 3, 2022, https://www.nbcnews.com/politics/elections/new-york-legislature-oks-gerrymander-net-democrats-3-seats-rcna14526; Aaron Navarro, *New York Democrats Advance New Congressional Map That Heavily Favors Democratic Party*, CBS News, Feb. 2, 2022, https://www.cbsnews.com/news/new-york-congressional-map-democrats/; *see also* Michael Li*, What Went Wrong with New York's Redistricting*, Brennan Center for Justice, June 7, 2022, https://www.brennancenter.org/our-work/research-reports/what-went-wrong-new-yorks-redistricting).  The Governor nonetheless signed the legislation into law on February 3, 2022.

*Harkenrider*

The *Harkenrider* petitioners promptly commenced a proceeding to invalidate as unconstitutional the congressional and senate maps, alleging that the legislature lacked authority to enact the maps absent a second-round IRC submission. The petitioners also alleged that the maps were drawn with unconstitutional partisan intent.

The *Harkenrider* petitioners ultimately prevailed on their procedural claim, as well as on their substantive gerrymander challenge to the congressional map (38 NY3d 494 [2022]). This Court declared both the congressional and state senate maps void because "the IRC's fulfillment of its constitutional obligations" was a prerequisite to—and limitation on—the legislature's authority to draft redistricting plans (*id.* at 514). Although the 2021 legislation purported to authorize the legislature to adopt redistricting maps even if the IRC failed to submit plans, we concluded that such legislation was "unconstitutional to the extent that it permits the legislature to avoid a central requirement of the reform amendments" (*id.* at 517). This Court also upheld the factual findings of the courts below that the congressional map was drawn with an unconstitutional partisan intent to discourage competition and favor Democrats. The Court remedied these violations by "endors[ing] the procedure directed by Supreme Court to 'order the adoption of . . . a redistricting plan' (NY Const, art III, § 4 [e]) with the assistance of a neutral expert, designated a special master, following submissions from the parties, the legislature, and any interested stakeholders who wish to be heard" (38 NY3d at 523). In doing so, we upheld the fundamental role of the courts—a role required by the Constitution—in protecting the right of the People of this State to free and fair elections untainted by partisan gerrymandering.

On May 20, 2022, the new congressional and state senate maps were promulgated by Supreme Court and, following minor revisions, that court certified the new maps on June 2, 2022.

The Instant Litigation

After the *Harkenrider* litigation had fully concluded, and five months after the IRC's January 25th deadline to submit a second-round redistricting plan to the legislature had passed, petitioners commenced this proceeding purportedly to enforce the bipartisan IRC process. Their amended petition sought a "writ of mandamus to compel" the IRC and its commissioners "to fulfill their constitutional duty . . . by submitting a second round of proposed congressional redistricting plans for consideration by the [l]egislature."

The members of the IRC aligned with the legislature's supermajority declined to oppose the petition, but the remaining IRC Commissioners moved to dismiss the proceeding as untimely and for failing to state a cognizable claim for relief under either the Constitution or this Court's decision in *Harkenrider*. Having successfully intervened, the *Harkenrider* petitioners also moved to dismiss the petition as untimely and on the basis that, in *Harkenrider*, this Court had already remedied the constitutional defect identified by petitioners by directing the enactment of new, nonpartisan maps. Supreme Court granted respondents' motions to dismiss, agreeing that the Constitution required the *Harkenrider* redistricting maps to remain in place until the next census.

On appeal, a divided Appellate Division reversed, granted the petition, and "direct[ed] the IRC to commence its duties forthwith" (217 AD3d 53, 62 [3d Dept 2023]). According to the Appellate Division, petitioners' claim against the IRC was timely because

it "accrued" on March 31, 2022, the date on which the *Harkenrider* Supreme Court ruled that the 2021 legislation purporting to allow the legislature to proceed absent a second IRC submission was unconstitutional (217 AD3d at 58). On the merits, the Appellate Division concluded that *Harkenrider* "exclusively addressed the Legislature's constitutional violations and, thus, did not remedy the IRC's failure to perform [its nondiscretionary constitutional] duty" (*id.*). The Appellate Division also reasoned that the Constitution authorized judicial intervention in redistricting only "to the extent . . . required" to remedy a violation of law and, in *Harkenrider*, "the Court was not 'required' to divert the constitutional process beyond the then-imminent issue of the 2022 elections" (217 AD3d at 60 [emphasis omitted]). Thus, in the Appellate Division's view, the congressional map adopted pursuant to *Harkenrider* was "merely an interim map for the purpose of the 2022 elections" and the IRC could be compelled to produce a second congressional map for the legislature's consideration (217 AD3d at 58).

Two Justices dissented. Initially, the dissenters would have rejected the petition as time-barred because petitioners unreasonably failed to demand the IRC perform its legal duty until five months after the IRC failed to act. Alternatively, the dissenters would have affirmed Supreme Court's denial of the petition because "the failure of the IRC to act . . . was . . . part and parcel" of our holding in *Harkenrider* that the originally enacted maps violated the Constitution's procedural requirements (217 AD3d at 68 [Pritzker, J. dissenting]). Further, this Court's remedy had already "repaired the procedural and substantive infirmities in a manner directly set forth in the NY Constitution" (*id.* at 68-69). Since a constitutionally-enacted "congressional map has been established and remains in

place" for the duration specified in the Constitution—namely, until the next federal census—the dissenters concluded that petitioners lacked any clear legal right to relief (*id.* at 70).

Respondents appealed as of right on double dissent grounds (*see* CPLR 5601 [a]). For the reasons detailed below, I would reverse and dismiss the proceeding.

## II.

Petitioners seek to compel the IRC to fulfill its constitutional duty "by submitting a second round of proposed congressional districting plans for consideration by the [l]egislature" (Amended Petition at 5 [¶ 14], 20 [Prayer for Relief]). As is proper, I will begin with the timeliness of this claim for relief, which the majority chooses to ignore for the first 24 pages of its opinion.

It is well-settled that a proceeding in the nature of mandamus to compel "must be commenced within four months . . . after the respondent's refusal, upon the demand of the petitioner . . . to perform its duty" (CPLR 217 [1]; *see Matter of Waterside Assoc. v New York State Dept. of Envtl. Conservation*, 72 NY2d 1009, 1010 [1988]; *Matter of De Milio v Borghard*, 55 NY2d 216, 220 [1982]; *Austin v Board of Higher Educ. of City of N.Y.*, 5 NY2d 430, 442 [1959]). As we have cautioned, however: "This does not mean that the aggrieved party can, by delay in making [a] demand, extend indefinitely the period during which [they are] required to take action. If [they do] not proceed promptly with [the] demand [they] may be charged with laches" (*Austin*, 5 NY2d at 442, citing 22 Carmody-Wait, New York Practice, §§ 289, 297, pp. 379, 388-390; *see also Matter of Sheerin v New*

*York Fire Dept. Articles 1 and 1B Pension Funds*, 46 NY2d 488, 496 [1979]; *Matter of Devens v Gokey*, 12 AD2d 135, 137 [4th Dept 1961], *affd* 10 NY2d 898 [1961]).

To avoid application of laches in this context, a "demand must be made within a reasonable time after the right to make [it] occurs" (*Matter of Devens*, 12 AD2d at 136) or, at the latest, "after the petitioner knows or should know of the facts which give [them] a clear right to relief" (*Matter of Granto v City of Niagara Falls*, 148 AD3d 1694, 1695 [4th Dept 2017] [internal quotation marks omitted]; *Matter of Barresi v County of Suffolk*, 72 AD3d 1076, 1076 [2d Dept 2010], *lv denied* 15 NY3d 705 [2010]; 24A Carmody-Wait 2d § 145:880).  In furtherance of the policies underlying CPLR 217 (1), four months has been deemed the longest possible period in which service of a demand can be considered reasonable (*see Matter of Norton v City of Hornell*, 115 AD3d 1232, 1233 [4th Dept 2014], *lv denied* 23 NY3d 907 [2014]; *Matter of Zupa v Zoning Bd. of Appeals of Town of Southold*, 64 AD3d 723, 725 [2d Dept 2009]; *Matter of Blue v Commissioner of Social Servs*, 306 AD2d 527, 528 [2d Dept 2003]; *Matter of Thomas v Stone,* 284 AD2d 627, 628 [3d Dept 2001], *lv dismissed* 96 NY2d 935 [2001], *lv denied* 97 NY2d 608 [2002], *cert denied* 536 US 960 [2002]; *Matter of Densmore v Altmar-Parish-Williamstown Cent. School Dist.*, 265 AD2d 838, 839 [4th Dept 1999], *lv denied* 94 NY2d 758 [2000]; *Devens*, 12 AD2d at 137; *Matter of Amsterdam City Hosp. v Hoffman*, 278 AD 292, 297 [3d Dept 1951]).  Unexcused delay of more than four months requires dismissal of the proceeding, even in the absence of any prejudice (*see Matter of Sheerin*, 46 NY2d at 495-496; *Devens*, 12 AD2d at 137).

Straightforward application of these well-settled principles can lead to only one conclusion: petitioners' claim was filed far too late. Petitioners seek enforcement of the IRC's duty to submit second-round maps to the legislature, but they did not demand that the IRC fulfill its constitutional duty when the commission announced on January 24th that it was deadlocked and therefore would not comply. Nor did petitioners make any demand when the IRC's constitutional deadline for the submission of second-round maps came and went on January 25th. Petitioners remained silent as the legislature introduced its own redistricting legislation on February 1st, removing the process entirely from the IRC and signaling that the legislature would proceed with redistricting despite the IRC's abdication of its constitutional duty. Petitioners also sat idle when the infirm redistricting legislation was delivered to the Governor and signed into law on February 3rd.

Petitioners' inaction continued throughout the entire *Harkenrider* litigation. Significantly, at oral argument before this Court on April 26, 2022, both the *Harkenrider* petitioners (intervenors here) and the state respondents acknowledged that mandamus relief "could have" been sought against the IRC at an earlier point, evidencing that the availability of such relief was always well understood (oral argument tr at 33, 46). Indeed, counsel for the Speaker of the Assembly stated that "there could have been a lawsuit brought by petitioners against the . . . members of the commission *but the . . . time passed*" (*id.* at 46 [emphasis added]).

Even after our decision in *Harkenrider*, most petitioners remained idle with respect to mandamus relief or chose to pursue alternative relief. Most notably, lead petitioner Hoffmann sought an order in the United States District Court for the Southern District of

New York requiring that the gerrymandered maps enacted by the legislature be used in the impending 2022 congressional elections (Doc. No. 1, complaint at 3, 13, in *De Gaudemar v Kosinski*, No.1:22-cv-3534 [SD NY May 2, 2022]).  The District Court harshly rejected that request to "hav[e] the New York primaries conducted on district lines that the State says are unconstitutional," referring to it as an attempt to "impinge[]" on "[f]ree, open, rational elections" (Doc. No. 92-2, transcript at 15, 40, in *De Gaudemar*, *supra*).  Only after these efforts failed, the special master maps were certified, and several more weeks had passed did petitioners finally seek mandamus relief against the IRC.

There is no excuse for this extravagant delay.  Even assuming petitioners' claim would have been deemed premature on January 24th—the day the IRC announced its stalemate—they had a clear right to mandamus relief against the IRC on January 25th, when the 15-day constitutional deadline elapsed without any second-round submission by the IRC.  Further, it is unfathomable that petitioners can argue that even after the Governor signed the legislature's maps into law on February 3rd, it remained unclear whether the IRC would act to deliver a second set of maps.  Because these events were unequivocal, petitioners' commencement of this proceeding on June 28th was "well beyond four months after they knew or should have known of the facts that provided them a clear right to relief" (*see Matter of Granto*, 148 AD3d at 1696).  Plainly, by then the ship had sailed.

Petitioners agree that this proceeding is governed by a four-month time limit, but argue that such period should be measured from March 31, 2022, the date the *Harkenrider* trial court declared the 2021 legislation unconstitutional.  However, the 2021 legislation neither relieved the IRC of its mandatory constitutional duty to submit second-round maps

nor concealed petitioners' clear right to mandamus relief arising from the breach of that duty on January 25th. The 2021 legislation provided merely that "[*i*]*f* the commission does not vote on any redistricting plan or plans, for any reason, by the date required for submission of such plan," the legislature could enact its own redistricting plan (L 2021 ch 633 § 1 [emphasis added]). Nothing in that language purports to modify the IRC's underlying constitutional duty to submit maps to the legislature, which is the very action petitioners now seek to compel. Moreover, it is a bedrock legal principle that statutes are subordinate to the Constitution and are void in the event of any conflict. Thus, even if the legislature had intended to relieve the IRC of its mandatory constitutional obligation, the only way to do so was to amend the Constitution. The legislature clearly understood this: it initially submitted the 2021 legislation to the People in the form of a ballot initiative for a proposed constitutional amendment. In rejecting that proposal, the People signaled their strong preference for the constitutionally mandated process, which—as I will explain— leaves remediation of any IRC breakdown primarily to the *courts*. The legislature's response was to ignore the voters' will and circumvent the Constitution by enacting the same provisions as an ordinary statute. That unsubtle effort to subvert the IRC's role was legally ineffective for the reasons stated above.

Petitioners nonetheless argue that the 2021 legislation effectively delayed accrual of their claim against the IRC because the legislature's enactment of maps significantly ameliorated any injury arising from the IRC's abdication of its constitutional duty. In addition to confusing the accrual date for mandamus to compel with that applicable to mandamus to review, this argument willfully ignores that the 2021 legislation inflicted the

same injury petitioners claim to have suffered in this proceeding: removal of the IRC from the map-drawing process. Unsurprisingly, then, the record does not support a conclusion that petitioners actually suffered from any confusion regarding their right to relief during the brief period in which the 2021 legislation was effective. If anything, the record suggests that Hoffmann and the other petitioners commenced this action as a fallback only after it became clear that they would not get the gerrymandered maps they desired: the true injury they seek to cure here.

Nor does petitioners' alternative argument that their claim accrued on February 28th fare any better. The February 28th cut-off date operates to shorten, not lengthen, the 15-day period that may be available to the IRC following the legislature's rejection of its first-round submission. The Constitution directs that, "[w]ithin [15] days" of the legislature's notification of its rejection of the first round of redistricting maps "and in no case later than February [28th], the [IRC] shall prepare and submit to the legislature a second redistricting plan" (NY Const, art III, § 4 [b]). The purpose of the February 28th outer deadline is to ensure that the legislature has sufficient time to act on a second-round submission before candidates must begin to canvass signatures from their districts and other election preparations must begin. By comparison, the Constitution affords the IRC more flexibility with respect to the deadline for its first-round submission, directing the IRC to submit its initial redistricting plan "on or before January first *or as soon as practicable thereafter* but no later than January [15th]" (NY Const, art III, § 4 [b] [emphasis added]), language notably lacking from the provision setting forth the IRC's deadline for its second-round

maps. By January 25th—not February 28th—petitioners were fully apprised of the facts necessary to make their demand that the IRC fulfill its constitutional duty.

Recognizing that petitioners' timeliness arguments cannot carry the day, the majority devises a novel theory not advanced by any party to this litigation. The majority declares that "the IRC's constitutional obligation may be enforced *at any time*," so long as the demand is made and refused "[]sufficiently ahead of the next election cycle to permit the IRC to perform its constitutional function" (majority op at 26 [emphasis added]). In other words, the majority decrees that the normal timeliness rules governing mandamus proceedings simply do not apply to this case. Even where the IRC has unequivocally violated its constitutional duties, and all applicable deadlines set forth in the Constitution have passed, the majority encourages a petitioner to sit on their rights for months, while other parties timely commence and prevail in litigation over the same facts, candidates and voters wait in limbo regarding district lines, and new maps are painstakingly developed and put in place.

This holding makes no sense. It is based on a conclusion that the IRC's duties are automatically revived any time a court orders the adoption of judicial maps, and therefore, what is being remedied here is not the violation of the January 25th IRC deadline, but some nebulous new duty that first sprung into being after *Harkenrider*. Even ignoring the lack of support for any such theory in either the Constitution or the pleadings, the majority's reasoning logically should require it to order that the *entire* IRC process now begin anew— a two-year process that would not afford petitioners the immediate relief they seek. Yet, the majority tellingly orders only that the IRC submit a second redistricting plan,

demonstrating that it is, in fact, simply ordering a different remedy for the same violation of law that was already remedied by this Court in *Harkenrider*.[2]

Because this proceeding was commenced long after petitioners should have known of their right to relief, seemingly for strategic reasons, "the solution is not to apply a different legal standard . . . , but to reject the petition for mandamus to compel" (*see Matter of Krug v City of Buffalo*, 34 NY3d 1094, 1099 [2019] [Wilson, J. dissenting]). Dismissal on laches and timeliness grounds would strongly discourage partisan actors from engineering future breakdowns of the IRC. Had petitioners acted reasonably following the IRC's violation of its duties on January 25th, they could have *immediately* sought and obtained an emergency order in the nature of mandamus compelling the IRC to submit a second redistricting plan in accordance with the timetable set forth in the Constitution while still giving the IRC and legislature each several weeks to act. The sad irony the majority refuses to recognize is that if petitioners had simply acted reasonably and in good faith following the IRC's breach of duty, the relief we ordered in *Harkenrider* may never have been necessary, and we might not be here today. Enforcing our ordinary timeliness principles is not "a way to undo the constitutional requirement that the court-drawn maps be only what is necessary to cure the violation" (majority op at 26). It is a way to ensure

---

[2] Contrary to the majority's contention, our decision in *Sheerin* in no way justifies today's ill-advised timeliness ruling. In holding that the laches doctrine "owes no necessary obeisance" to the statute of limitations in mandamus proceedings, the Court was rejecting an argument that "once the right [to mandamus] is established, laches is unavailable to restrict . . . the remedy to cover a period longer or shorter than that prescribed by any available Statute of Limitations" (46 NY2d at 496). Nothing in *Sheerin* authorizes this Court to effectively abolish the statute of limitations and laches principles applicable to mandamus proceedings in this context.

that the courts are never "required" to order such maps in the first place. If the majority truly sees the remedy we ordered in *Harkenrider* as an evil to be avoided (*see* Part III, *infra*), it should encourage prompt action upon the breakdown of the IRC process, not sanction the unreasonable delay that occurred here.

III.

Even if we were to put aside, as the majority does, what is a legally insurmountable timeliness hurdle, this Court has already remedied the IRC's failure to fulfill its constitutional duty. A petitioner seeking mandamus to compel "must have a clear legal right to the relief demanded and there must exist a corresponding nondiscretionary duty on the part of the administrative agency to grant that relief" (*Matter of Scherbyn v Wayne-Finger Lakes Bd. of Coop. Educ. Servs.*, 77 NY2d 753, 757 [1991]). "The duty must be positive, not discretionary, and the right to its performance must be so clear as not to admit of reasonable doubt or controversy" (*Matter of Burr v Voorhis*, 229 NY 382, 387 [1920]). Applying these well-settled principles to the instant case, mandamus is available to petitioners only if they have demonstrated that the IRC has an "exist[ing]," "clear," and "nondiscretionary" duty to submit a second-round redistricting plan to the legislature, even after our decision in *Harkenrider* and the promulgation of the remedial maps by Supreme Court in accordance with that decision (not to mention long after the passage of the constitutional deadlines).

Petitioners do not, and cannot, make any such showing. Petitioners are not entitled to mandamus relief because the IRC's failure to fulfill its constitutional duty was remedied by this Court in *Harkenrider*. Once remedied, the IRC's duty dissipated, leaving no

performance to compel by mandamus.  Absent any substantive challenge to the current redistricting plan in effect, the decennial redistricting process has concluded.  Petitioners therefore have no right—let alone any clear legal right—to compel the IRC to submit a congressional redistricting plan to the legislature.

*Harkenrider* clearly addressed and remedied the breakdown of the constitutional map-drawing process, including the IRC's failure to submit second-round maps within the constitutionally required timeframe.  We held that "*the IRC and the legislature* failed to follow the procedure commanded by the State Constitution," and we characterized the "primary questions before us" as "whether this failure to follow the prescribed constitutional procedure warrants invalidation of the legislature's congressional and state senate maps" (38 NY3d at 501-502 [emphasis added]).  The *Harkenrider* petitioners "alleged that the process by which the 2022 maps were enacted was constitutionally defective *because* the IRC failed to submit a second redistricting plan as required under the 2014 constitutional amendments" (*id.* at 505 [emphasis added]), and we agreed that, "in light of the lack of compliance *by the IRC and the legislature* with the procedures set forth in the Constitution, the legislature's enactment of the 2022 redistricting maps contravened the Constitution" (*id.* at 508-509 [emphasis added]).

In claiming otherwise, the majority erroneously treats the lack of an order against the IRC requiring specific performance of its constitutional duty as a failure to remedy the breakdown of the constitutional process.  But that is not how stare decisis or the judicial remediation of injury works.  In ordering new maps to be drafted by a neutral expert following a period of input from the public, interested stakeholders, and the legislature,

under the supervision of a Supreme Court Justice, we indisputably provided a legal substitute (i.e. a remedy) for the IRC's failure to submit bipartisan maps. That remedy was fully supported by the Constitution, specifically our duty to engage in "expedited judicial review of redistricting challenges" and " 'order the adoption of . . . a redistricting plan' in the absence of a constitutionally-viable legislative plan" so as "to guarantee the [P]eople's right to a free and fair election" (*Harkenrider*, 38 NY3d at 521-522, quoting NY Const, art III, § 4 [e]).

Nor can *Harkenrider* reasonably be understood to have ordered the adoption of "interim" maps for use solely in the 2022 elections. This Court's opinion necessarily referenced the impending 2022 election at various intervals. However, such references served only to clarify that the remedy would not be postponed until after the 2022 elections, as requested by the state respondents. Had this Court intended to limit its remedy to a single election cycle and contemplated the need for further redistricting thereafter, our failure to expressly so direct would be inexplicable and derelict, needlessly leaving New York in election limbo (*compare Honig v Board of Supervisors of Rensselaer County*, 24 NY2d 861, 862 [1969] [directing that a reapportionment plan for election of county board of supervisors proceed on maps as an "interim measure" and that the County Court of Supervisors "proceed as promptly as circumstances permit to promulgate a plan of reapportionment (for use in future elections) meeting constitutional standards"]).

Unwilling to accept our reasoning in *Harkenrider* or accept the remedy this Court put in place, the majority discards both. It proclaims the holding in *Harkenrider* "wholly irrelevant" (majority op at 22) because, in its view, the judiciary is constitutionally

prohibited from ever ordering the adoption of maps for more than a single election (*id.* at 14-15).[3]  Its sole support for this startling conclusion is the first sentence of article III, section 4 (e), which provides as follows:

> "The process for redistricting congressional and state legislative districts established by this section and sections five and five-b of this article shall govern redistricting in this state except to the extent that a court is required to order the adoption of, or changes to, a redistricting plan as a remedy for a violation of law" (NY Const, art III, § 4 [e]).

According to the majority, the four words "to the extent . . . required" effected a sea change in the courts' ability to adjudicate and remedy constitutional violations of the redistricting process.  As the majority reads the language, a court may now order the adoption of, or changes to, a redistricting plan only to the extent *and for the minimum period of time required* to remedy a violation of law (*see* majority op at 14-19).

An obvious problem with the majority's reading is that it rewrites the constitutional text.  As a grammatical matter, the phrase "to the extent . . . required" does not modify the courts' power "to order the adoption of, or changes to, a redistricting plan as a remedy for a violation of law"—it modifies the subject of the sentence, which is "[t]he process for redistricting . . . established by [§§4, 5, & 5-b] shall govern" (NY Const, art III, § 4 [e]).  Thus, contrary to the majority's conclusion, the clause does not limit the circumstances

---

[3] The majority's eagerness to relitigate the Harkenrider remedy is not surprising given their disagreement in that case (*see Harkenrider*, 38 NY3d at 527 [Wilson, J., dissenting]; *id.* at 546 [Rivera, J., dissenting]; *id.* at 524 [Troutman, J., dissenting in part]).  However, stare decisis does not permit the majority to overturn our precedent merely because they would "decide [the] case differently now than we did then" (*Dobbs*, 597 US at 388 [Breyer, Sotomayor, and Kagan, JJ., dissenting]).

under which a court can order the adoption of a redistricting plan to remedy a constitutional violation. Instead, the sentence clarifies that the IRC and legislature must comply with the deadlines, voting requirements, and other procedural rules set forth in the referenced constitutional provisions. If they fail to do so, the clause reaffirms—in the context of the new system adopted by the People—the courts' traditional power to remedy violations of law.

The "to the extent . . . required" clause does not speak to the duration of the remedy. Indeed, the only language in the Constitution explicitly referencing the duration of maps immediately follows and directs—without exception for maps adopted by a court—that "such plan shall be in force until the effective date of a plan based upon the subsequent federal decennial census . . . unless modified pursuant to court order" (NY Const, art III, § 4 [e]). Contrary to the majority's suggestion, the phrase "unless modified pursuant to court order" does not exclude new, remediated maps from the ten-year rule. Rather, the Constitution clearly commands that once a constitutional redistricting plan is put into effect—either by the legislature or, when necessary, by the courts—such plan governs until the next census absent further court-ordered modifications to remedy additional violations of law. Rearranging key phrases and changing what they modify may superficially work to achieve the majority's ends, but it cannot override the meaning of the words in their proper order, or read out provisions of the Constitution.

In *Harkenrider*, this Court determined that it was required to order the adoption of maps as a constitutional remedy for a variety of reasons, including but not limited to: the inability to maintain the 2012 maps following the 2020 census (38 NY3d at 504); the

procedural unconstitutionality of the legislature's congressional and state senate maps, which rendered them invalid in their entirety (*id.* at 514-522); the substantive unconstitutionality of the legislature's congressional map (*id.* at 519-520); the fact that "[t]he deadline in the Constitution for the IRC to submit a second set of maps ha[d] long since passed" (*id.* at 523); the exigencies created by the impending 2022 elections (*id.* at 507); and the preserved arguments of the parties who timely sought relief from the courts. Those maps, created by order of this Court, are now constitutionally required to remain in force until the next census (*see* NY Const, art III, § 4 [e]).

The restrictions our Constitution places on mid-decade legislative redistricting are consistent with traditional practice and make particular sense considering the goal of the 2014 amendments—unmentioned by the majority—to avoid partisan gerrymandering (*see* NY Const, art III, § 4 [c] [5] ["Districts shall not be drawn to discourage competition or for the purpose of favoring or disfavoring incumbents or other particular candidates or political parties"]). Mid-decade legislative redistricting is notorious for being conducted "with the sole purpose of achieving a [partisan] majority" (*League of United Latin Am. Citizens v Perry*, 548 US 399, 417 [2006] [observing the legislature appeared to redistrict solely to achieve a republican congressional majority]) or "to benefit the political party that most recently received unified control of the state government" (Patrick Marecki, *Mid-Decade Congressional Redistricting in a Red and Blue Nation*, 57 Vand L Rev 1935, 1961 [2004]). A good example would be the 2003 redistricting in Texas, which resulted in that State's congressional delegation flipping from a 17-15 Democratic majority to a 21-11 Republican majority (*see League of United Latin Am. Citizens*, 548 US at 412-413).

Indeed, in notable contrast to the potentially limitless reapportionment cycle sanctioned by the majority, legislation introduced in congress has attempted to preclude any "State which has been redistricted in the manner provided by law" from being "redistricted again until after the next apportionment of Representatives" unless a court finds that the existing map is, in some way, substantively flawed (HR 42, 118th Cong [2023]).  The parallel language of article III, section 4 (e) of our Constitution demonstrates that similar restrictions already exist in New York—or did until today.

The majority nonetheless posits that the background against which the 2014 amendments were approved supports its conclusion that the Constitution requires all court-drawn maps to be interim in duration.  It observes that for more than half a century before the 2014 constitutional amendments, every legislative redistricting in New York was subject to court intervention and many resulted in decade-long judicial maps.  The majority concludes from this history that judicially created maps are part of the problem the People sought to correct in approving those amendments (*see* majority op at 8, 20-21).

Nothing in the legislative history of the 2014 amendments even remotely supports that conclusion (*see* Governor's Approval Mem, Bill Jacket, L 2012, ch 17 at 5-6 [far from complaining about judicial intervention in redistricting, expressing concern that the legislative redistricting process was "*largely immune* from legal challenges to partisan gerrymandering" (emphasis added)]).  If anything, the extensive history detailed by the majority establishes that it is only through judicial intervention—including, in many cases, the adoption of judicially-crafted decade-long maps—that fair elections were held in this State for much of the past century.  The availability of decade-long judicial maps as a

remedy also ensured that elections were only unsettled by litigation once per decade, rather than every other year. Insofar as the Constitution should be interpreted consistent with this historical context, it defies reason to suggest that the drafters of the 2014 amendments— while endeavoring to provide more substantial checks on legislative abuse—acted to diminish the judiciary's role and power as *the* critical backstop against those very abuses. Ultimately, the majority's false narrative distracts from the critical aim of the 2014 amendments: free and fair elections through the elimination of partisan gerrymandering, a goal furthered by our decision and remedy in *Harkenrider* and substantially undermined by the majority's holding today.

The majority also ignores the practical consequences of its holding. It appears to believe that once the IRC has submitted a second set of redistricting maps to the legislature, the matter will be settled for the remainder of the decade. If, however, the process again breaks down or results in another partisan gerrymander, the courts may again be required to intervene, invalidate the legislature's map, and reimpose the special master's map for the 2024 elections. Under the majority's logic, mandamus relief against the IRC would again lie, with the potential for the process to be repeated serially until 2032 and then every two years thereafter.

Short of the complete elimination of judicial review, a legislature determined to enact gerrymandered maps could not have asked for a more favorable ruling than they have received. At the start of each decade, the majority members can enact egregious gerrymanders, secure in the knowledge that if their plan is rejected by the courts, they will have another opportunity to enact maps only slightly less infected with partisan intent—

and so on and so on—until the maps just barely pass constitutional muster.  This is not what the People voted for in 2014 and 2021.  Rather, it is a perversion of the constitutional amendments that increases the likelihood of partisan gamesmanship and future litigation.

Ultimately it is today's remedy, not *Harkenrider*'s, that exceeds what is "required" to cure a violation of law.  In *Harkenrider* we were faced with a congressional map that was both gerrymandered and enacted without constitutional authority, and we devised an appropriate remedy that cured both the procedural and substantive unconstitutionality.  Indeed, the special master's congressional map currently in effect has not been substantively challenged in this or any other proceeding.  Under that map, "almost one in five seats are competitive, the highest percentage in the country for a large state," whereas "[h]ad the map passed by the Democratic-controlled legislature remained in place, no districts would have been competitive" (Michael Li & Chris Leaverton, *Gerrymandering Competitive Districts to Near Extinction*, Brennan Center for Justice, Aug. 11, 2022, https://www.brennancenter.org/our-work/analysis-opinion/gerrymandering-competitive-districts-near-extinction).  The maps put in place after *Harkenrider*, especially the congressional map, defy the national trend of increasingly partisan districts.  Neither petitioners nor the majority have articulated any legitimate interest—let alone a violation of law—that requires such maps to be replaced at this stage.

IV.

The majority's self-imposed restriction on judicial authority to remedy illegal gerrymandering is especially concerning coming as it does on the heels of the United States Supreme Court's parallel abdication of that power.  Although the Supreme Court has long

had "a special responsibility to remedy violations of constitutional rights resulting from politicians' districting decisions," it has in more recent years begun to disavow federal judicial review of partisan gerrymandering claims (*Rucho*, 588 US at ___, 139 S Ct at 2523 [Kagan, J. dissenting]).  Instead, the Supreme Court has held that it is up to the states to curtail partisan gerrymandering through "state statutes and state constitutions" (*Rucho*, 588 US at ___, 139 S Ct at 2507) and that, while redistricting may traditionally be a legislative function, *state courts* are the appropriate tribunals to hold state legislatures to compliance with state constitution redistricting requirements (*see Moore v Harper*, 600 US 1, 34 [2023]).  Throughout the country, since *Rucho*, state courts have "become a primary firewall against gerrymandering as both Democrats and Republicans try to carve out maximum advantages in the maps they control" (Nick Corasaniti & Reid J. Epstein, *As Both Parties Gerrymander Furiously, State Courts Block the Way*, NY Times, Apr. 2, 2022).

Last year, for example, the Supreme Court of North Carolina upheld that Court's "solemn duty" to review the legislature's redistricting plans for constitutional conformity to protect "the constitutional rights of the people to vote on equal terms" by striking down egregious and intentional partisan gerrymanders by the Republican party, thereby ensuring that complaints of gerrymandering were not destined to "'echo into a void'" (*Harper v Hall*, 380 NC 317, 323, 868 SE2d 499, 510 [2022], quoting *Rucho*, 588 US at ___, 139 S Ct at 2507).  Earlier this year, the same Court granted rehearing upon the legislature's request that the Court "revisit" its determination that "claims of partisan gerrymandering are justiciable under the state constitution" (*Harper v Hall*, 384 NC 292, 299, 886 SE2d

393, 399 [2023]). This time, the Court held "that partisan gerrymandering claims present a political question that is nonjusticiable under the North Carolina Constitution" (*id.* at 300, 886 SE2d at 401). As lamented by the dissent, "[n]othing ha[d] changed since" the Court's earlier decision: "[t]he legal issues [were] the same; the evidence [was] the same; and the controlling law [was] the same" (*id.* at 423, 886 SE2d at 476 [Earls, J. dissenting]).

So too here. Despite the majority's futile attempts to distinguish *Harkenrider*, nothing has changed since we decided that case just last year. Now, as then, the Constitution authorizes judicial intervention in the redistricting process only when circumstances require that the courts remedy a violation of law. Now, as then, we are asked to remedy a constitutional deficiency in the 2022 redistricting process that was attributable to the IRC's abdication of its constitutional duty. In *Harkenrider*, we ordered a remedy for the IRC and legislature's procedural violation that was constitutionally authorized. Now, as then, the Constitution mandates that the resulting constitutionally enacted and substantively unchallenged maps remain in force until the next federal census. This time, however, politics triumphs over free and fair elections.

Order affirmed, with costs. Opinion by Chief Judge Wilson. Judges Rivera, Troutman and Renwick concur. Judge Cannataro dissents in an opinion, in which Judges Garcia and Singas concur. Judge Halligan took no part.

Decided December 12, 2023